NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,

and

State of South Carolina, ex rel. T. Travis Medlock, Attorney General, Plaintiff-Intervenor,

v.

William A. VAUGHN, et al., Defendants.

Civ. A. No. 82–3173.

United States District Court, District of Columbia.

July 15, 1983.

S. Jacob Scherr, Natural Resources Defense Council, Washington, D.C., Kenneth P. Woodington, Asst. Atty. Gen., State of S.C., Columbia, S.C., for plaintiffs.

Perry E. Wallace, Jr., Land & Natural Resources Div., Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiffs, Natural Resources Defense Council, Inc. ("NRDC") and 11 other environmental and citizens' groups and individuals, have filed suit against officials of the Department of Energy ("DOE") seeking an injunction against the restart of a nuclear reactor located at the Savannah River Plant ("SRP") in Aiken, South Carolina, until such time as an environmental impact statement ("EIS") has been prepared pursuant to the National Environmental Policy Act of 1969, 42 U.S.C., §§ 4321 *et seq.* ("NEPA"). Plaintiffs have moved for summary judgment, and they are joined by plaintiff-intervenor, the State of South Carolina, which also seeks a preliminary injunction. For the reasons set forth below, plaintiffs' motions for summary judgment will be granted in part, and defendants shall be ordered to prepare and file an EIS. The Court, however, will defer decision on plaintiffs' application to enjoin the restart of the reactor pending further hearing as hereinafter provided.

### I.

In response to the Executive's perceived need for additional nuclear weapons material, DOE began, in November, 1980, to restore and upgrade L-Reactor, one of five nuclear reactors located in the Savannah River Plant, a nuclear park covering some 192,000 acres near Aiken, South Carolina. L-Reactor began operation in July, 1954, producing plutonium and tritium for the Atomic Energy Commission's nuclear weap-

ons program. In February, 1968, prior to the enactment of NEPA, L-Reactor was shut down and placed in "stand-by status." (It has, therefore, never been the subject of an EIS nor, for that matter, has the entire Savannah River Plant). L-Reactor is expected to cost approximately $214 million to overhaul and prepare for restart, is currently scheduled to commence operation in October, 1983, and when in operation once again will add about 350 employees to the SRP complex.

■ Section 102(2)(C) of NEPA, 42 U.S.C., § 4332(2)(C), requires all federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." An EIS must contain "a detailed statement of the expected adverse environmental consequences of an action, the resource commitments involved in it, and the alternatives to it." *Kleppe v. Sierra Club,* 427 U.S. 390, 401–02, 96 S.Ct. 2718, 2726, 49 L.Ed.2d 576 (1976). DOE has, of course, the "initial and primary responsibility for ascertaining whether an EIS is required," and its determination may be set aside only if it has abused its discretion or has acted arbitrarily. *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1002 (D.C.Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980).

DOE has not been heedless of its obligation to assess the environmental impact of restart of the L-Reactor. In January, 1981, pursuant to its own internal NEPA compliance procedures, it prepared an "action description memorandum" to assess the various methods under which it might determine the restart's environmental consequences, as well as an environmental information document ("EID") listing some of the effects to be anticipated. It then developed an environmental compliance/study plan to identify those studies necessary to meet the requirements of the applicable regulations and initiated an archaelogical

survey and some five separate ecological studies.

In May, 1981, DOE contracted with a private corporation to prepare an "EIS-level" document to be based on the EID, the studies ordered by DOE, and such information the contractor might develop independently. Then in January, 1982, the Assistant Secretary for Emergency Preparedness determined that an environmental assessment ("EA") should be prepared to provide the basis for determining the need for an EIS. That document, submitted by the contractor to DOE in May, 1982, in draft and revised, constituted the basis for DOE's "finding of no significant impact," 47 Fed. Reg. 36,691, on August 23, 1982. Considering "the previous impacts in the area due to the operation of L-Reactor from 1954 to 1968," DOE concluded, "the impacts resulting from the resumption of L-Reactor operation should not be significant." It did not, therefore, undertake preparation of an EIS.

■ The Court finds this conclusion alone to be arbitrary and an abuse of discretion. The antecedent studies appear to be both candid and thorough, and as to DOE itself evince the "hard look at environmental consequences" required of it. *NRDC v. Morton,* 458 F.2d 827, 838 (D.C.Cir.1972); *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 20, 96 S.Ct. 2718, 2730 n. 20, 49 L.Ed.2d 576 (1976). But they also leave no doubt that, by any reasonable construction of the term, the effects of the reactor's restart will be significant enough to call for an environmental impact statement.

II.

DOE's Environmental Assessment explains quite clearly (and defendants have acknowledged) many of the direct effects of the restart of L-Reactor.[1] It will discharge about 175,000 gallons of water per minute into Steel Creek, a tributary of the Savannah River, at temperatures of between 158°

---

1. The Court disregards both those effects alleged which DOE does not concede, as well as many having more subtle or remote implica-

tions which it does. *See Metropolitan Edison Co. v. PANE,* —— U.S. ——, 103 S.Ct. 1556, 1561–62, 75 L.Ed.2d 534 (1983).

and 176° F.,[2] "eliminating" approximately 1,000 acres of wetlands previously affected by L-Reactor's operations but now recovering from the earlier thermal trauma, and destroying habitat for the American alligator, waterfowl, and fish-spawning. An additional seven to ten acres will succumb each year thereafter. It will add to the 150-acre delta formed by its operation (in conjunction with another reactor) in years past in the Savannah River swamp at the rate of about three acres per year. It will release substantial quantities of radionuclides and other contaminants, some of which will seep into the ground and may penetrate the watertable aquifer and neighboring surface-water systems. And it will generate from 290,000 to 607,000 gallons of liquid waste per year.

As a general proposition it appears that the start-up of *any* nuclear reactor is treated as a "major" federal action requiring consideration of environmental effects of an order of magnitude appropriate to their "significance," *see Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 538–39, 98 S.Ct. 1197, 1208–09, 55 L.Ed.2d 460 (1978); *Baltimore Gas & Electric Co. v. NRDC,* —— U.S. ——, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983), even restarts of dormant reactors which have previously been the subjects of environmental impact statements. *Metropolitan Edison Co. v. PANE, supra,* —— U.S. ——, n. 1, 103 S.Ct. 1558, n. 1.

DOE's own environmental homework, reflected in and represented primarily by its Environmental Assessment, provides extensive information on the anticipated consequences of the resumption of L-Reactor's operations. Plaintiffs do not object to any paucity of data so much as they do to the fact that, once published with its finding of no significant impact, the EA ends the process, whereas an EIS must be "exposed to the comments" of other federal and state agencies and the public before becoming final, and may force consideration of alternatives. 42 U.S.C., § 4332(2)(C)(iii); 40 C.F.R. §§ 1503.1, 1503.2, 1507.2(d) (1982). Such a project as the L-Reactor restart, they say, should be compelled to justify itself publicly before becoming a *fait accompli* though its ramifications may be largely known in advance.

DOE contends that L-Reactor's restart is essentially a phase in an otherwise continuous federal action—the uninterrupted 30-year operation of the entire SRP since the early 1950's—and must, therefore, be considered in historical context in which the inquiry should be whether it will produce any adverse *incremental* impact of significance on the environment. But DOE concedes that in the 15 years elapsed since L-Reactor was placed in stand-by, Steel Creek and its environs, while still showing "considerable evidence" of its past thermal stress, has been recovering and become a productive ecosystem.

DOE cites four cases as its principal authority for the proposition that NEPA evaluations of "continuing activities" need only consider "incremental" impact to determine significance. While the concept of significance is clearly one of relativity, each of those cases in which EIS's were found to be unnecessary is both quantitatively and qualitatively distinguishable from the case at bar.[3] Moreover, none of those cases pur-

---

**2.** Pursuant to the National Pollutant Discharge Elimination System, 33 U.S.C. § 1251 *et seq.,* the State of South Carolina's Department of Health and Environmental Control ("SCDHEC") has promulgated regulations which would prohibit the discharge of water at temperatures greater than 90° F. into Steel Creek (a class B waterway). SCDHEC contends that to comply with state law, DOE must request a thermal variance to have the stream reclassified, an action that would require the approval of the South Carolina General Assembly. To date, such a variance has not been requested. When the federal government "exercises its sovereignty" to override local law, "more careful scrutiny" under NEPA is required. *Maryland-National Capital Park & Planning Commission v. U.S. Postal Service,* 487 F.2d 1029, 1037 (D.C.Cir.1973).

**3.** *Sierra Club v. Hassell,* 636 F.2d 1095 (5th Cir.1981) involved the replacement of a bridge between the mainland and an offshore island three months following the original's destruction by a storm; *City & County of San Francisco v. United States,* 615 F.2d 498 (9th Cir.1980)

ports to establish a rule that, as to continuing activities, NEPA requires only additional damage to be taken into account without regard to recuperation during any hiatus. To apply such a rule of continuity here would, in effect, hold that what has been despoiled before can be so again unless it is made significantly worse. Nothing in NEPA itself, its history, or its subsequent interpretation by any court suggests that Congress intended such a result.

■ The Court holds that it is the environment as it is found contemporaneously with an agency's decision to embark upon an action which may change it, not the condition in which it may have been left before, which is the benchmark from which alteration of the status quo is to be measured in assessing the significance of such actions for NEPA purposes.

DOE also contends that, while about 8,000 acres of wetlands would experience some impact, only Steel Creek would be devastated, and Steel Creek represents less than one percent of the Savannah River System's total wetland resources. But the destruction of a natural feature of substantial magnitude in absolute dimensions—and 1,000 acres of stream and marsh would seem to be such—is no less significant to South Carolina, although it may have an abundance of wetlands, than, for example, the demolition of a mountain would be to Montana merely because there are more where it came from. The State of South Carolina, which will bear the brunt of the harmful effects (as well as reaping some benefits) of L-Reactor's operations, has found that these effects are significant enough to it to warrant the State's formal intervention and active participation in this proceeding to ask that an EIS be prepared. That, too, is evidence of the significance of the L-Reactor's effects on the quality of the

human environment most immediately affected.

The Court finds that restart of the L-Reactor is a major federal action significantly affecting the environment and concludes that it requires preparation of an environmental impact statement, and it is, therefore, this 15th day of July, 1983,

ORDERED, that plaintiff's and plaintiff-intervenor's motions for summary judgment are granted in part; and it is

FURTHER ORDERED, that the Department of Energy is directed to prepare and publish an environmental impact statement as soon as practicable; and it is

FURTHER ORDERED, that hearing on plaintiff-intervenor South Carolina's application for a preliminary injunction and trial of both plaintiffs' claims for a permanent injunction (which are hereby consolidated pursuant to Fed.R.Civ.P. 65(a)(2)) shall be held on August 16, 1983 at 9:30 a.m.

---

challenged the lease of a shipyard two years after the Navy had halted its own shipbuilding on the premises; *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992 (D.C.Cir. 1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980), permitted the government to lease a parcel of its land in downtown Washington which had been used continuously for parking to a private company for the same purpose; and *Cobble Hill Association v. Adams,* 470 F.Supp. 1077 (E.D.N.Y. 1979) allowed temporary detours to be established while an existing roadway was repaired.