# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 14-1680

PAUL L. OLLIS, APPELLANT,

V.

ROBERT A. MCDONALD,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued August 18, 2015                                    Decided October 28, 2015)

*Paul M. Schoenhard*, of Washington, D.C., with whom *Samuel L. Brenner*, of Boston, Massachusetts, was on the brief, for the appellant.

*Mark D. Vichich*, with whom *Leigh A. Bradley,* General Counsel; *Mary Ann Flynn*, Assistant General Counsel; and *Drew A. Silow*, Acting Deputy Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before KASOLD, PIETSCH, and GREENBERG, *Judges.*

KASOLD, *Judge*, filed the opinion of the Court. GREENBERG, *Judge*, filed a dissenting opinion.

KASOLD, *Judge*: Veteran Paul L. Ollis appeals through counsel[1] that part of an April 1, 2014, Board of Veterans' Appeals (Board) decision that denied his claim for benefits under 38 U.S.C. § 1151 for a cardiac disability and phrenic nerve paralysis. Mr. Ollis argues that the Board erred in finding that a VA doctor's advice and recommendations regarding a medical procedure, which ultimately was performed in August 2007 by a non-VA employee in a non-VA facility, fell outside the scope of section 1151. A panel decision is warranted to address this issue of first impression. *See Frankel v. Derwinski*, 1 Vet.App. 23, 25-26 (1990). For the reasons stated below, that part of the decision on appeal will be affirmed.

## I. BACKGROUND

---

[1] Mr. Ollis filed his Notice of Appeal and initial brief pro se but obtained counsel prior to supplemental briefing.

Mr. Ollis served on active duty from June 1975 to March 1976. In 1997, he was diagnosed with atrial fibrillation.[2] In order to resolve daily episodes of dizziness, light-headedness, and faintness, he underwent an ablation procedure[3] in March 1999 at the Nashville VA medical center (VAMC) and received a pacemaker in July 1999. Throughout the next decade, however, the episodes continued. During this time, Mr. Ollis received medical treatment from the Nashville VAMC, and also from his private cardiologist, Dr. Stephen Teague of Parkway Cardiology, who began seeing Mr. Ollis as early as September 2000.

In June 2007, Mr. Ollis visited the Nashville VAMC for a pacemaker interrogation.[4] As recorded in the medical progress notes, Mr. Ollis informed a VA nurse practitioner that he had experienced another episode in January 2007 and had follow-up with Parkway Cardiology.[5] Mr. Ollis expressed a desire not to go through the ablation procedure again and inquired about MAZE[6] treatment for his atrial fibrillation. The VA nurse practitioner explained that such a procedure was not performed at the Nashville VAMC, but she noted that she would ask Dr. Jeffrey Rottman, also of the Nashville VAMC, to review Mr. Ollis's record and make further recommendations. Seven days later, Dr. Rottman reviewed Mr. Ollis's record and stated in the medical progress notes that, "[s]ur[gi]cal MAZE is one avail[a]ble option. The epicardial MAZE would be the current preference. While this is not available at the VA (specialized operators and equipment are required), it could be performed at other local institutions. Recommendations provided." Record (R.) at 1318.

---

[2] "Atrial fibrillation" is "an arrhythmia in which minute areas of the atrial myocardium are in various uncoordinated stages of depolarization and repolarization due to multiple reentry circuits within the atrial myocardium . . . causing a totally irregular, often rapid ventricular rate." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 701 (32d ed. 2012) [hereinafter DORLAND'S].

[3] This procedure delivers electrical energy through a catheter to cut away at the heart tissue causing the atrial fibrillation. See DORLAND'S at 3-4.

[4] A "pacemaker interrogation" measures the functioning and battery status of a pacemaker. See Record (R.) at 1316-17.

[5] The record reflects that this follow-up was with Dr. Teague. See R. at 403, 404.

[6] "Maze" procedure is the "surgical division of the normal conduction pathways between the sinoatrial node and the atrioventricular node by a series of incisions in the left atrium to create a maze of conduction pathways; its purpose is to allow a normal impulse to activate the atrium while eliminating macroreentrant circuits; done for the relief of atrial fibrillation." DORLAND'S at 1517.

In July 2007, Mr. Ollis visited Dr. Teague to discuss the surgical and medical approaches to atrial fibrillation. Dr. Teague's progress note does not mention any VA recommendation or referral. Rather, the progress note reflects that the discussion "comes on the heels of a recent pacemaker interrogation," that Mr. Ollis wanted to talk directly to Dr. William Hall of Methodist Medical Center (MC) regarding the surgical approach, and that "[Mr. Ollis] will be referred." R. at 405. Dr. Teague also suggested that Mr. Ollis "may wish to discuss the situation with Dr. Ro[tt]man." *Id*. There is no indication from the record that Mr. Ollis followed up on this suggestion prior to the August 2007 surgery.

Three weeks after Mr. Ollis visited Dr. Teague, another private physician, Dr. Hall, evaluated Mr. Ollis for the surgical MAZE procedure. In his progress note, Dr. Hall thanked Dr. Teague for "asking us to see this patient." R. at 87. The progress note does not mention a VA recommendation or referral. Subsequently, in August 2007, Dr. Hall performed the surgery at Methodist MC, which was paid for by Mr. Ollis and his private insurance company. *See* R. at 480. For purposes of this opinion, it is assumed that Mr. Ollis's right phrenic nerve was damaged during the procedure and that his cardiac issues resumed following the surgery.

In July 2008, Mr. Ollis filed for VA benefits for his disabilities related to the August 2007 MAZE procedure. He stated that the procedure was performed at Methodist MC, "where the VAMC Nashville, Heart Department, referred me." R. at 1395. Throughout his administrative appeal, Mr. Ollis argued that VA should be held liable for the treatment he received as a result of VA's referral or recommendation. *See*, *e.g.*, R. at 862 (Mr. Ollis stating in 2009 Notice of Disagreement that his condition was "the result of treatment received from VA refer[r]ed care"), 851 (Mr. Ollis stating in 2009 letter to VA Nashville regional office that VA should be held "responsible for my condition based on [a] referral" from Dr. Rottman to Parkway Cardiology), 496 (Mr. Ollis stating in 2011 Substantive Appeal that "VA should be held liable for the treatment that caused the injury"), 484 (Mr. Ollis stating "Yes" in his 2011 Board hearing in response to hearing officer's question: "Your argument is that while it wasn't done at a V.A. facility, it was done upon the recommendation of V.A., correct?").

The Board decision on appeal addressed Mr. Ollis's argument and rejected it. The Board found that VA's Dr. Rottman had recommended the MAZE procedure as one option to treat atrial

3

fibrillation but that the procedure was ultimately performed at a non-VA facility by a non-VA employee. The Board found "no evidence that VA required the private provider to act on it[s] behalf," or that VA supervised or had a contract with Dr. Hall. R. at 19. The Board concluded that the facts of Mr. Ollis's case fell outside the scope of section 1151.

## II. THE PARTIES' ARGUMENTS

In his initial pro se brief, Mr. Ollis (1) notes that VA's Dr. Rottman provided "recommendations of facilities to perform this [MAZE] procedure," and that Mr. Ollis himself "chose a facility that was close to home and family," (2) contends that he "was never instructed at any time by VA about the consequences of having this [procedure] performed without a referral from them," and (3) asks the Court "to consider the recommendations as a verbal referral." Appellant's (App.) Brief (Br.) at 3-4.

Upon obtaining counsel, Mr. Ollis argues that (1) the medical advice and recommendations of VA's Dr. Rottman constituted VA medical treatment that was causally connected to his claimed disabilities, and (2) the record was not fully developed on several issues of proximate cause; i.e., whether VA personnel advised Mr. Ollis of the risks of the procedure or whether the disabilities were not reasonably foreseeable, and whether VA personnel failed to investigate the credentials and capabilities of the recommended doctors such that the recommendation or referral was negligent. Mr. Ollis additionally argues that, when a VAMC cannot perform a procedure, VA has a statutory and constitutional duty to inform a veteran that procedures performed at a non-VA facility might affect section 1151 eligibility. *See* App. Supplemental (Supp.) Br. at 11-17 (citing, inter alia, 38 U.S.C. § 6303(c) and *Cushman v. Shinseki*, 576 F.3d 1290 (Fed. Cir. 2009)).[7]

The Secretary argues that section 1151 is limited by its plain language to medical procedures performed "by a Department employee or in a Department facility," 38 U.S.C. § 1151(a)(1), and that the MAZE procedure here was performed by a private doctor, Dr. Hall, in a private facility. Alternatively, the Secretary asserts that Mr. Ollis's disability was not caused by any VA treatment;

---

[7] Mr. Ollis also contends in his supplemental brief that section 1151 should not be interpreted in a way that creates a perverse incentive for VA to refer or recommend veterans to non-VA facilities in order to avoid section 1151 awards. Succinctly stated, he fails to demonstrate that the denial of medical services in his case was so motivated, and we find no basis for presuming that VA personnel might be perversely motivated to refer patients for non-VA care to avoid section 1151 awards. Other than this notation, we do not further address Mr. Ollis's unfounded suggestion.

4

rather, Mr. Ollis visited another private physician, Dr. Teague, on his own initiative – not based upon a VA referral – and then underwent the surgery by Dr. Hall based on Dr. Teague's referral. The Secretary additionally contends that any medical advice or recommendation by VA's Dr. Rottman was too attenuated to Mr. Ollis's postsurgery disabilities to be considered their cause. Finally, the Secretary contends that there is no statutory or constitutional right to information about section 1151 when a VAMC cannot perform a procedure.

### III. ANALYSIS

#### A. Section 1151 and Causation

"Section 1151 delineates three prerequisites for obtaining disability compensation." *Viegas v. Shinseki*, 705 F.3d 1374, 1377 (Fed. Cir. 2013). First, the claimant must demonstrate a current disability that is not the result of his own willful misconduct. Second, the disability must have been "caused by hospital care, medical or surgical treatment, or examination furnished the veteran under any law administered by the Secretary, either by a Department employee or in a Department facility." 38 U.S.C. § 1151(a)(1). Third, the "proximate cause" of the disability must be negligence "or similar instance of fault on the part of [VA]" or "an event not reasonably foreseeable." § 1151(a)(1)(A)-(B).

The Board determined that the facts here did not meet the second requirement (causation) for section 1151 compensation. The Board explained that VA's Dr. Rottman had recommended the MAZE procedure as one available option but that the procedure was ultimately performed – and the disabilities sustained – at a private facility by a private doctor, with no evidence of any contract or relationship between VA and that private doctor. Thus, the Board found that the disabilities were not "caused by a Department employee or in a Department facility." R. at 20.

On appeal, Mr. Ollis disputes this finding. He asserts that the medical advice and recommendations from VA's Dr. Rottman constituted medical treatment that caused Mr. Ollis to visit Dr. Teague, who then referred Mr. Ollis to Dr. Hall, who performed the surgery that resulted in the disabilities. Otherwise stated, Mr. Ollis contends that Dr. Rottman's actions "'gave rise to the risks out of which the injury arose,'" and therefore were a cause of the disabilities. App. Supp. Br. at 6 (quoting VA Gen. Couns. Prec. 7-97, at 7-8 (Jan. 29, 1997) (citing *O'Leary v. Brown-Pacific-Maxon, Inc.*, 340 U.S. 504 (1951))).

At the outset, we note that Mr. Ollis's argument that VA's Dr. Rottman "caused" Mr. Ollis

to seek treatment from Dr. Teague or Dr. Hall, both private physicians, was not raised below by Mr. Ollis or otherwise reasonably raised by the record before the Secretary and the Board, and we find no error in the Board's not addressing this issue. *See Robinson v. Peake*, 21 Vet.App. 545, 552 (2008) (Board must address all issues raised by the claimant or reasonably raised by the record), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009). Nevertheless, this argument presents a novel issue and we find the argument well formed and worthy of consideration. *See Maggitt v. West*, 202 F.3d 1370, 1377 (Fed. Cir. 2000) (holding, inter alia, that the Court has discretion to hear legal arguments for the first time on a claim properly before the Court).

To understand section 1151's causation requirement, it is important to review the evolution of the current statutory language, binding caselaw addressing this language, and general views of causation in federal practice. Before 1996, section 1151 required that a current disability be "the result of hospitalization, medical or surgical treatment . . . under any of the laws administered by the Secretary" and "not the result of willful misconduct." In *Brown v. Gardner*, 513 U.S. 115, 119 (1994), the Supreme Court held that such language did not require a showing of fault by the VA; rather, the language "simply [ ] impose[d] the requirement of a causal connection between" the disability and the VA treatment.

In 1996, Congress amended the statute, adding a requirement that the disability be *proximately* caused by VA fault or an event not reasonably foreseeable. The primary purpose of the amendment was to add the element of VA fault to section 1151. *See Bartlett v. Shinseki*, 24 Vet.App. 328, 330 n.2 (2011) (citing, inter alia, 142 CONG. REC. S9932 (daily ed. Sept. 5, 1996)). Congress also replaced the phrase "the result of" with "caused by," but the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has noted that this change "does not appear to have been a substantive change." *Viegas*, 705 F.3d at 1382 n.5.

Addressing the "caused by" language in *Viegas*, the Federal Circuit rejected the Secretary's position that this language requires a disability to be "directly caused by" VA medical treatment, but also rejected a broader view proposed by the appellant. *See id.* at 1378. The Federal Circuit invoked *Gardner*, held that section 1151 requires "only a 'causal connection'" between the disability and VA treatment, *id.* at 1380 (quoting *Gardner*, 513 U.S. at 119), and further held that section 1151 "does not extend to the 'remote consequences'" of VA medical treatment. *Id.* at 1383.

6

The notion that section 1151's causation requirement – even before the separate "proximate cause" requirement was added to the statute – does not extend to remote consequences of VA conduct accords with the prevalent practice throughout the federal courts. Although "'[i]n a philosophical sense, the . . . causes of an event go back to the dawn of human events . . . , any attempt to impose responsibility upon such a basis would result in infinite liability,'" and federal statutes with causative language have often been read to exclude remote consequences. *Rite-Hite Corp. v. Kelly Co., Inc.*, 56 F.3d 1538, 1546 n.4 (Fed. Cir. 1995) (en banc) (quoting W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 41, at 264 (5th ed. 1984)); *see CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2642 (2011) ("To prevent 'infinite liability,' . . . courts and legislatures appropriately place limits on the chain of causation that may support recovery on any particular claim. The term 'proximate cause' itself is hardly essential to the imposition of such limits."); *see also Pac. Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 690-91 (2012) (rejecting interpretation of "as the result of" language in workers' compensation statute that would, "[t]aken to its logical conclusion," encompass workers whose jobs have "virtually nothing to do with" the operations noted in the statute); *Rite-Hite Corp.*, 56 F.3d at 1546 (despite the broad language of 35 U.S.C. § 284, "remote consequences" are not compensable).

Overall, the federal courts have recognized that conduct is not a "cause" of an injury in the legal sense if the injury would have occurred regardless of the conduct, or if there is an intervening exercise of independent judgment, or if the injury is simply too attenuated from the conduct. *See*, *e.g.*, *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) ("Some effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation, will nonetheless not fall within [the statute's purview] because the causal chain is too attenuated."); *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 179 (2d Cir. 2013) ("A defendant's conduct is not a cause-in-fact of an injury or loss if the injury or loss would have occurred regardless of the conduct."); *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (noting, in the context of an unlawful arrest and subsequent conviction and incarceration, that the chain of causation to the arresting officer is severed by an intervening exercise of independent judgment).

Such an attenuation is present here. Based on the record of proceedings (ROP) and facts found by the Board, Mr. Ollis's disability was, at best, a remote consequence of – and not caused by

7

– VA's conduct.[8] *See Gardner*, 513 U.S. at 119; *Viegas*, 705 F.3d at 1383. Although it is unclear what doctors or institutions VA's Dr. Rottman recommended to Mr. Ollis, Dr. Rottman's contemporaneous medical note highlights the MAZE procedure as one option and references providing multiple recommendations. *See* R. at 1318. The record further reflects that, about a week after his meeting with Dr. Rottman, Mr. Ollis visited his longtime private physician Dr. Teague, who referred him to Dr. Hall, another private physician, without any indication that VA was involved. *See* R. at 405 (Dr. Teague's July 2007 progress note stating that Mr. Ollis "will be referred" to Dr. Hall), 87 (Dr. Hall's July 2007 progress note specifically thanking Dr. Teague for "ask[ing] us to see this patient"). Dr. Hall, a non-VA employee, performed the disabling surgery in a non-VA facility, and the Board found no contractual or agency relationship between VA and Dr. Hall. *See* R. at 19. Based on the ROP, the Board's finding is plausible and not clearly erroneous. *See Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) ("'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948))); *see also U.S. Gypsum Co.*, 333 U.S. at 396 (assigning little probative weight to testimony that conflicted with contemporaneous documents).

Assuming arguendo that Dr. Rottman's advice and recommendations constitute "medical . . . treatment . . . by a Department employee" (38 U.S.C. § 1151(a)(1)), this "treatment" did not *cause* Mr. Ollis to have the surgery with Dr. Hall. Even assuming that Dr. Teague and Dr. Hall were two of the private doctors recommended by VA's Dr. Rottman, the fact remains that Dr. Teague specifically referred Mr. Ollis to Dr. Hall, and Mr. Ollis chose to have the MAZE procedure performed by Dr. Hall. Based on these intervening and independent actions by non-VA actors, the conduct of VA's Dr. Rottman suggesting some physicians to Mr. Ollis that could perform the MAZE procedure, or even referring him to several physicians, is simply too remote from Mr. Ollis's disability to be considered its cause. *See Gardner*, 513 U.S. at 119; *Viegas*, 705 F.3d at 1383.

---

[8] Our dissenting colleague notes our holding that Mr. Ollis's disability was not caused by VA conduct because it was, at best, a remote consequence of VA medical treatment, but he fails to note that the Federal Circuit's *Viegas* decision addresses causation and constitutes a binding precedent that is consistent with the general interpretation of "proximate cause" in the federal courts, as discussed in the text prior to this note.

B. Negligent Referral

With regard to whether the record was properly developed on the issue of negligent referral, we note that there is no indication from the record that Mr. Ollis raised this issue below. Rather, Mr. Ollis contended during the administrative processing of his claim that VA should be held liable for the consequences of its referral, and the Board addressed this argument. Because the negligent-referral issue was not reasonably raised below, we find no error in the fact that it was not addressed or developed by the Board. *See Robinson*, *supra*. Additionally, Mr. Ollis fails to identify any evidence indicating that Dr. Hall was not qualified to perform the MAZE procedure or that VA medical personnel were negligent in any recommendation regarding who might be able to perform the MAZE procedure. His arguments regarding negligent referral are, therefore, speculative at best, and we decline to address such assertions further. *See Brewer v. West*, 11 Vet.App. 228, 236-37 (1998) (where appellant offers "mere assertions" without providing legal support, the Court need not further discuss the argument); *see also Maggitt*, *supra*.

C. Duty To Inform Claimants About Section 1151

Mr. Ollis additionally asserts that he was never informed that undergoing the MAZE procedure at a non-VA facility might affect his eligibility for section 1151 benefits, and he argues that VA has a statutory and constitutional duty to provide such information when a VAMC cannot perform a procedure. In support of this argument, Mr. Ollis (1) cites 38 U.S.C. § 6303(c), which states that the Secretary "shall distribute full information to eligible veterans and eligible dependents regarding all benefits and services to which they may be entitled under laws administered by the Secretary," and (2) states that it is "surely inappropriate" that hundreds of thousands of veterans are being referred from VAMCs to private facilities each month, without information as to how that might affect their eligibility for section 1151 benefits. Mr. Ollis also cites *Cushman* for the propositions that (1) he has a constitutionally protected property interest in his application for benefits, 576 F.3d at 1298, and (2) his property interest may not be deprived without notice and a fair opportunity to be heard, *id.* at 1296.

Initially, the Court notes that these arguments were not raised by Mr. Ollis to the Board, or reasonably raised by the record, and we find no error in the Board not addressing them. *See Robinson*, *supra*. Nevertheless, we find them well formed and worthy of consideration in the

9

first instance. *See Maggitt*, *supra*. As to Mr. Ollis's statutory argument, the language of section 6303(c) was located at 38 U.S.C. § 7722(c) prior to 2006 and was reviewed by the Federal Circuit in 2003. The language was found to be hortatory, rather than an enforceable legal obligation. *See Andrews v. Principi*, 351 F.3d 1134, 1137 (Fed. Cir. 2003); *Rodriguez v. West*, 189 F.3d 1351, 1355 (Fed. Cir. 1999) (discussed in *Andrews*). As to Mr. Ollis's argument that the current referral procedures are "surely inappropriate," that argument is a red herring. Regardless of whether it is "inappropriate," Mr. Ollis fails to demonstrate that such notice is legally required. *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) (appellant bears burden of demonstrating error on appeal), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table).

Our dissenting colleague cites an American Medical Association (AMA) opinion in support of his view that patients of VA medical care should not be "induced" to waive their eligibility for section 1151 benefits without informed consent. *Post* at 13. With great respect for our colleague, the facts of this case do not support the underlying suggestion that Mr. Ollis was "induced" to waive any benefits under section 1151. Moreover, the AMA opinion amounts to a suggestion to inform a patient if treatment by a referred medical specialist or facility is not covered by the patient's insurance; the opinion says nothing about notifying a patient that the referring doctor would not be liable for negligent medical care provided by the referred medical specialist or facility. This case does not involve a request for reimbursement of medical expenses and thus we find the AMA opinion inapposite here.

In support of his constitutional argument that claimants possess a due process right to be notified before losing eligibility for benefits, Mr. Ollis cites *United States v. Copeland*, 376 F.3d 61, 70-73 (2d Cir. 2004), and *United States v. Lopez-Velasquez*, 629 F.3d 894, 897 n.2 (9th Cir. 2010). *Copeland* held that an immigration judge's failure to inform an alien of eligibility for relief from deportation may be fundamentally unfair, but the *Copeland* court based its analysis on an immigration statute, 8 U.S.C. § 1326(d)(3), not on due process. And, although *Lopez-Velasquez* used the term "due process," the "failure to inform" in that case was a failure that occurred during administrative deportation proceedings – not, as here, before administrative proceedings commenced. We therefore find these cases inapposite.

With regard to *Cushman*, the Federal Circuit held in that case that a veteran has a protected

10

property interest in a given disability benefit "upon a showing that he meets the eligibility requirements set forth in the governing statutes and regulations." 576 F.3d at 1298. If a veteran *does not meet* the eligibility requirements for that benefit, however, he does not have a protected property interest in it. *See id.* at 1297 (noting "an absolute right of benefits to *qualified* individuals" (emphasis added)); *see also Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) ("To have a property interest in a benefit, a person [ ] must . . . have a legitimate claim of entitlement to it."). This principle recently was made clear by the Federal Circuit in *Devlin v. Office of Pers. Mgmt.*, 767 F.3d 1285, 1288 (Fed. Cir. 2014), where the appellant (representing his mother's estate) argued that his mother had a protected property interest in certain death benefits. The Federal Circuit rejected his argument because (1) filing an application for the benefits was a statutory prerequisite for entitlement to those benefits, and (2) his mother never filed an application that would have established her eligibility. Citing *Cushman* in support, the Federal Circuit held that, "[b]ecause she did not file the necessary application," the appellant's mother "was not entitled to [the death benefits] and thus had no protected property interest in those benefits." *Devlin*, 767 F.3d at 1288. Here, at the time Mr. Ollis was told that VA could not perform his surgery, he had not shown his eligibility for section 1151 benefits. He had not undergone the MAZE procedure, suffered an additional disability, or filed an application for section 1151 benefits. *See Cushman*, 576 F.3d at 1297 ("[*A*]*pplicants* for . . . benefits possess a constitutionally protected property interest in those benefits." (emphasis added)). Succinctly stated, Mr. Ollis's property interest would not vest until and unless he met the eligibility requirements for section 1151 benefits. Therefore, the lack of notice to Mr. Ollis that undergoing the MAZE procedure at a non-VA facility might affect his section 1151 eligibility if his third-party medical care was negligently provided did not constitute a constitutional due process violation, and we find no basis for inserting such a notice requirement within the section 1151 statutory scheme for VA benefits caused by hospital care, medical or surgical treatment.

## D. Remaining Arguments

Because Mr. Ollis does not demonstrate that he meets the second requirement for section 1151 compensation, his argument related to section 1151's third requirement – whether VA medical personnel advised him of the risks of the procedure or whether the disabilities were not reasonably foreseeable – need not be addressed. *See Viegas*, 705 F.3d at 1377 (noting three prerequisites for

11

benefits under section 1151). In sum, Mr. Ollis fails to demonstrate that VA personnel or treatment caused the disability for which he seeks VA benefits, and he otherwise fails to demonstrate that the Board erred in denying entitlement to benefits under section 1151. *See Hilkert*, *supra*.

## IV. CONCLUSION

Upon consideration of the foregoing, that part of the April 1, 2014, Board decision on appeal is AFFIRMED.

GREENBERG, *Judge*, *dissenting*: I dissent. The majority's application of 38 U.S.C. § 1151 is unduly narrow and withdraws necessary protections from a rapidly growing class of veterans.

The Board determined that the appellant was not eligible for benefits based on his phrenic nerve paralysis because that disability was not "caused by hospital care, medical or surgical treatment, or examination furnished the veteran under any law administered by the Secretary, either by a Department employee or in a Department facility as defined in section 1701(3)(A) of this title." 38 U.S.C. § 1151(a)(1). The majority holds that the Board did not err in its reasoning, because "section 1151 does not extend to the 'remote consequences' of VA medical treatment."[9]

When a veteran's doctor recommends a course of treatment, it is not a remote consequence of that recommendation for the veteran to pursue it. The appellant's uncontroverted testimony at his Board hearing is dispositive: when he went to the VA medical center with questions regarding the MAZE procedure, his treating physician, Dr. Rottman,[10] specifically "*recommended* that I have the

---

[9] The majority accurately describes the Supreme Court's holding in *Brown v. Gardner*, 513 U.S. 115 (1994), that at the time of the decision, 38 U.S.C. § 1151 lacked a requirement that additional disability be the result of VA carelessness, negligence, lack of proper skill, error in judgment, or similar instance of indicated fault. The majority also correctly states that Congress amended section 1151 in 1996 and added the requirement that disability be proximately caused by VA fault or an event not reasonably foreseeable. That fault requirement is not before the Court; the appellant's eligibility for benefits, governed by the first clause of § 1151(a)(1), is in question, but his entitlement to those benefits, governed by the remainder of § 1151(a), including subsections (A), (B), and (2), has not yet been considered by the Court or even the Board.

[10] In an August 10, 2013, letter to VA, the appellant states:

Records show that in 1998, Dr. Crocker, (Knoxville VA outpatient facility) referred me to Nashville VA Cardiology, stating that the Nashville VA has some of the best cardiologist[s] in the nation and that I should have them check me out. I agreed to the referral and have been under the care of these cardiologists ever since. I started seeing Dr. Rottman in 1998 for my atrial fib[rillation]. In 1999 an

12

procedure because of my age. [Dr. Rottman] thought I could handle it a lot better than somebody at the age of seventy." R. at 479 (emphasis added). The doctor did not, as the majority suggests, merely perform the administrative task of notifying the appellant of local medical institutions, without endorsing any procedure or medical provider. The record indicates the appellant went to his doctor for *medical advice*, the doctor *recommended* that the appellant undergo the MAZE procedure, and the appellant *consequently* had it performed, resulting in his phrenic nerve injury. The connection between the doctor's recommendation and the performance of the procedure here is hardly attenuated.

I am further concerned that the majority endorses absolving VA and its physicians of any duty to warn claimants when a medical recommendation jeopardizes eligibility for section 1151 benefits. Irrespective of due process, it is inequitable for the appellant to be induced, through a VA doctor's medical recommendation, to waive his eligibility for section 1151 benefits without informed consent as to that waiver. The Court should take heed of the American Medical Association's recognition that "[i]f a physician knows that a patient's health care plan or other agreement does not cover referral to a non-contracting medical specialist or to a facility that the physician believes to be in the patient's best interest, the physician should so inform the patient to permit the patient to decide whether to accept the outside referral." *Code of Medical Ethics* Opinion 8.132 (Am. Med. Ass'n 2007). VA's provision of medical care helps fulfill a promise to our nation's veterans, but it must be implied in that promise that VA will not accept, much less impel, unknowing waiver. This promise is similar to those implied in all contracts. *See, e.g., Wood v. Duff-Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 (1917) (Cardozo, J.) ("The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal."). As a matter of equity, the Court should at least hold that a veteran cannot lose section 1151 eligibility when he or she has followed a VA medical recommendation and was never properly informed of the possible

---

attempt was made to do an ablation at the VA in Nashville. This procedure was unsuccessful at which time a month later, a pacemaker was installed to help with my problem. Records show in 2005 that the pacemaker was defective and the generator was replaced. Then in 2007 this new procedure (Mini Maze) was available and it was then discussed with me to attempt this procedure to correct the atrial fib.

R. at 96. It does not appear from the record that, in his 9 years of treating the appellant prior to 2007, Dr. Rottman had ever recommended a procedure that required the appellant to seek care at a non-VA institution.

consequences.

Permitting such a remedy for veterans is necessary in light of recent developments expanding the provision of care to veterans by non-VA facilities. *See*, *e.g.*, Pub. L. No. 113-146, § 101(a)(1)(A), (B) (2014) ("The Veterans Access, Choice, and Accountability Act of 2014"). The Court should not reduce the reach of the protective benefits of section 1151 just as Congress increases the number of veterans who will need them. I cannot join a holding that frustrates the veteran-friendly intent of Congress. *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 n.*, 1 L. Ed. 436 (1792) ("[T]he objects of this act are exceedingly benevolent, and do real honor to the humanity and justice of Congress.").