In re Steven Rollins SCOTT, d/b/a Steve R. Scott & Assoc., f/d/b/a Tempo Centre, 811 Barton, Debtor.

Steven Rollins SCOTT, d/b/a Steve R. Scott & Assoc., f/d/b/a Tempo Centre, 811 Barton, Plaintiff,

v.

RESOLUTION TRUST CORPORATION as Receiver of Southwest Federal Savings Association, Defendant.

Bankruptcy No. 91–51178C.
Adv. No. 91–05168C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

July 25, 1993.

300

Barbara M. Barron, Manuel H. Newburger, Barron & Newburger, P.C., Austin, TX, for debtor/plaintiff.

J. Matthew Dow, Michael V. Baumer, Small, Craig & Werkenthin, Austin, TX, Warren D. Campbell, Donohoe, Jameson & Carroll, LLP, Dallas, TX, for defendant RTC.

*DECISION AND ORDER ON PLAINTIFF'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT*

LEIF M. CLARK, Bankruptcy Judge.

■ CAME ON, for consideration, the Motion of the Defendant, the Resolution Trust Corporation (the "RTC"), to Dismiss, or, in the Alternative, for Summary Judgment. The RTC asserts, *inter alia*, that this court lacks subject matter jurisdiction over this adversary proceeding, and that the Debtor–in–Possession ("DIP") is not entitled to affirmative recovery against the RTC as a matter of law. The court denied the Motion to Dismiss as untimely, but entertained the Motion for Summary Judgment since lack of subject matter jurisdiction can be raised at any time.[1] Upon consideration thereof, the court concludes that the RTC's Motion for Summary Judgment should be granted, in part, and denied, in part.

## JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 11 U.S.C. §§ 105, 544(a)(1), 544(a)(3) and 543. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The RTC contests this court's subject matter jurisdiction, arguing that 12 U.S.C. § 1821(d)(13)(D) deprives this court of jurisdiction notwithstanding 11 U.S.C. § 1334(b).

## FACTUAL SUMMARY

On July 12, 1985, Steven Rollins Scott ("Scott") and Lamar Savings Association ("Lamar") entered into a construction loan agreement for the development and construction of an office building at 811 Barton Springs Road, Austin, Texas (the "Property"). Scott signed a promissory note for $18,400,000 ("Note") in favor of Lamar. The Note was secured by a properly filed Deed of Trust. In March 1987, the Note was extended and secured by a

---

1. *See* Fed.R.Civ.Proc. 12(h)(3).

Renewal Deed of Trust and Security Agreement.

The Property is composed of two adjacent tracts of land, Tract I and Tract II. The parties of course intended that the Note be secured by both tracts, but only the legal description of Tract I was actually inserted into the Deed of Trust. The mistake went unnoticed by Scott and Lamar, and as a result, the planned office building was constructed, using the development loan. The building of course spanned both tracts of the Property. Most of the building sits on the much larger Tract I, with about 9.23% of the net rentable space sitting on Tract II, along with a part of the building's mechanical room, as well as the building's only fire lane.

Subsequent to the maturity date of the Note as extended, Scott fell into default. On April 5, 1988, Lamar foreclosed. Of course, only Tract I was covered by the Renewal Deed of Trust and Security Agreement, and only Tract I was described in the foreclosure papers, including the Substitute Trustee's Deed delivered to the purchaser after the foreclosure. Lamar was the successful bidder, bidding in a portion of its Note. Still unaware that Tract I did not encompass all the building at 811 Barton Springs, Lamar innocently assumed control over the entire building, and began collecting rents and managing the property. Lamar also repossessed the personalty used in connection with the Property, claiming that this personalty had been pledged to Lamar in the Addendum to the Deed of Trust and in the Renewal Deed of Trust and Security Agreement. Lamar asserted the balance of the Note (that part not already used to bid in at the foreclosure sale) as a deficiency claim against Scott.

The very next month, May 1988, Lamar was declared insolvent, and the Federal Savings and Loan Insurance Corporation ("FSLIC") was appointed as Receiver. FSLIC then transferred certain Lamar assets, including the Note and Lamar's interest in the Property, to Southwest Savings.

Some eighteen months later, the mistake in the Deed of Trust was discovered. Scott sued Southwest Savings to recover Tract II, and Southwest responded, filing its own lawsuit for reformation of the Note, Deed of Trust and Substitute Trustee's Deed of Trust to include Tract II. Significantly, a *lis pendens* regarding this litigation was never filed by Southwest or by any of its successors in interest.

Six months later, Southwest Savings was itself in financial trouble and the RTC was appointed as its conservator. The reformation suit was subsequently removed to federal court in Dallas, Texas. Just two days later, on June 15, 1990, Southwest Savings was formally declared insolvent by the Office of Thrift Supervision, and the RTC[2] was appointed Receiver. The RTC then organized Southwest Federal Savings, into which it transferred some of the assets of Southwest Savings, including the Note and Southwest Savings' interest in the Property.

Around March 1, 1991, Southwest Federal filed a Motion for Summary Judgment in the reformation litigation. Before that Motion could be ruled on, however, Scott filed this Chapter 11 case (on April 2, 1991, the "Petition Date"), calling into existence the Debtor–in–Possession who is now the plaintiff in this adversary proceeding. *See* 11 U.S.C. §§ 1101, 1107; *see also* H.R.Rep. No. 595, 95th Cong., 1st. Sess. 404 (1977) ("this section places a debtor in possession in the shoes of a trustee *in every way.* The debtor is given the rights and powers of … [is] to perform the functions and duties of … [and] is also subject to any limitations on a chapter 11 trustee").[3] In June

---

**2.** The Federal Savings & Loan Insurance Corporation had its own financial difficulties, and its threatened insolvency led to the passage of FIRREA, which dissolved both FSLIC and the Federal Home Loan Bank Board, then created the Office of Thrift Supervision, and the Resolution Trust Corporation, operating under the direction of the Federal Deposit Insurance Corporation. *See generally* H.R.Rep. No. 54(I), 101st. Cong, 1st Sess. 352 (1989).

**3.** Since the distinction between the pre-petition person and the post-petition estate is crucial in this case, Scott, as a debtor-in-possession, will hereinafter be referred to as the "DIP."

of that year, Southwest Federal sought relief from the automatic stay to pursue the reformation litigation then thought pending in Federal District Court, but the federal case had been administratively closed as a result of the bankruptcy filing, so there was no longer a case pending there to pursue. A month later, in July 1991, Southwest Federal was itself declared insolvent, and the RTC was again appointed Receiver.

The next month, on August 12, 1991 the DIP filed this adversary proceeding against the RTC, seeking declaratory relief, turnover of assets, and monetary damages, all arising out of the peculiar circumstances surrounding Tract II. On February 28, 1992, this court granted Plaintiff's Motion For Partial Summary Judgment, concluding that title to Tract II had of course never been conveyed to Lamar in the foreclosure (because it had never been conveyed to the trustee in the Deed of Trust), that legal title to Tract II remained with Scott, becoming property of the bankruptcy estate upon the filing of his bankruptcy petition, that, because the DIP enjoyed a bona fide purchaser status under the Bankruptcy Code, the RTC could not seek reformation of the Renewal Deed of Trust and the Security Agreement against the DIP, and that, therefore, the RTC had to surrender control of Tract II to the DIP and not act in any manner inconsistent with the estate's exclusive interest in Tract II and the improvements and fixtures thereon. All this meant that the RTC could no longer have tenants occupying that portion of the building sitting on Tract II, could no longer collect rents from those tenants, and could not have access to most of the mechanical room, which sat on Tract II. It also meant that the remaining portion of the building on Tract I no longer had a fire

lane and so was in violation of City of Austin fire regulations.

The RTC, incredulous at this turn of events,[4] adopted a "make me" hardline stance and refused to budge. It refused to move out of that part of the building sitting on Tract II, and continued to operate the 811 Barton Springs Road as though nothing had happened. It also refused to pay any rent to the DIP. Indeed, the RTC for a time actually denied the DIP access to that portion of the building sitting on Tract II. The RTC of course never surrendered possession and control of Tract II to the DIP, nor were the parties able to reach any settlement of their differences, despite repeated attempts. Eventually, the DIP sought and obtained an enforcement order from this court, setting a monthly charge for the RTC's continued wrongful use of Tract II. It took a threat of contempt to force the RTC to honor this order and pay the DIP.

At this last stage of the proceeding, the DIP now seeks, *inter alia*, judgment for (a) post-foreclosure income stream, (b) future investment value of the building and/or future income stream, (c) lost profits resulting from the RTC's negligence in marketing the building, (d) value of personalty converted, (e) emotional distress, (f) interest as damages, (g) exemplary damages, and (h) attorneys' fees. On the eve of trial, the RTC filed this Motion for Summary Judgment, claiming for the first time that this court lacks subject matter jurisdiction pursuant to 12 U.S.C. § 1821(d)(6)(A), and that Scott may not recover affirmative, monetary relief against the RTC as a matter of law. The court proceeded to trial, in the interests of judicial economy,[5] reserving ruling on the summary judgment motion, now the subject of this decision.

---

**4.** It is difficult to understand the RTC's incredulity, as the entire turn of events arose out of the sort of mistake normally covered by title insurance. For reasons not immediately apparent to the court, the title insurance company elected to engage in this extended litigation in lieu of simply settling the claim and pursuing the person responsible for preparing the faulty Deed of Trust.

**5.** The court and the parties agreed that, were the court to have ruled on the summary judgment motion first, the parties faced the prospect of an appeal of a grant of that motion, followed perhaps by a reversal and remand for trial, followed in turn by another appeal. By proceeding to try the case, the parties can appeal all matters in issue at once, and were able to put on their evidence while it was fresh.

## SUMMARY JUDGMENT STANDARD

 The standard for deciding requests for summary judgment is well settled: summary judgment is proper if the party moving for such a judgment establishes that there is an absence of genuine issue of material fact. *See* FED.R.BANKR.P. 7056(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986). Once a movant has made such a showing, the nonmovant must establish each of the challenged essential elements of its case for which it will bear the burden of proof at trial. *See Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552. The nonmovant may satisfy this burden by tendering depositions, affidavits, and other competent evidence, *see* FED.R.BANKR.P. 7056(e), but "mere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *See Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). In short, "the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." *See* FED.R.BANKR.P. 7056(e). In making its determination, the court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986) (citation omitted). If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is

no genuine issue for trial, and summary judgment may be granted as a matter of law. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

## DISCUSSION

### I. *FIRREA'S JURISDICTIONAL LIMITATIONS*

 On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). FIRREA sets up a detailed regulatory framework for restoring the financial integrity of the federal deposit insurance fund, providing funds from public and private sources to deal expeditiously with failed depository institutions. *See Circle Indus. v. City Fed. Sav. Bank,* 749 F.Supp. 447, 451 (E.D.N.Y.1990), *aff'd,* 931 F.2d 7 (2d Cir.1991). FIRREA includes, *inter alia,* an administrative claims procedure for resolving claims asserted against the RTC in its capacity as receiver of the failed depository institution.[6] 12 U.S.C. § 1821(d). Under this procedure, the RTC must be the *initial* arbiter of any claims asserted against it as receiver of a failed depository institution. Section 1821(d)(5) provides, in pertinent part:

(A) Determination Period

(i) In general—

Before the end of the 180–day period beginning on the date any claim against a depository institution is filed with the Corporation as receiver, the Corporation shall determine whether to allow or disallow the claim and shall notify the claimant of any determination with respect to such claim.

---

**6.** The Second Circuit recently gave the following overview of FIRREA's claims handling procedure:

As receiver, the RTC has the power to disallow "any claim by a creditor or claim of security, preference, or priority which is not proved to the satisfaction of the [RTC]." *See* 12 U.S.C. § 1821(d)(5)(D). This decision generally must be made within six months of the making of the claim. *See id.* § 1821(d)(5)(A). If the claim is disallowed by the RTC, the claimant may request an administrative review of that decision, or file "a suit on such

claim" in the federal district court. *See id.* § 1821(d)(6).... Until such time as the claim is disallowed by the RTC, "no court shall have jurisdiction over ... any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [RTC] has been appointed receiver, including assets which the [RTC] may acquire from itself as such receiver." 12 U.S.C. § 1821(d)(13)(D)(i).

*Resolution Trust Corp. v. Elman,* 949 F.2d 624, 627 (2d Cir.1991),

12 U.S.C. § 1821(d)(5)(A). After submitting to this initial RTC determination, a claimant can obtain *de novo* judicial review of the RTC's determination pursuant to 12 U.S.C. § 1821(d)(6). That section provides:

(A) In general—

Before the end of the 60–day period beginning on the earlier of—

(i) the end of the period described in paragraph (5)(A)(i) with respect to any claim against a depository institution for which the Corporation is receiver; or

(ii) the date of any notice of disallowance of such claim pursuant to paragraph (5)(A)(i),

the claimant may request administrative review of the claim in accordance with subparagraph (A) or (B) of paragraph (7) *or file suit on such claim* (or continue an action commenced before the appointment of the receiver) *in the district court or territorial court of the United States for the district within which the depository institution's principal place of business is located or in the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)*

12 U.S.C. § 1821(d)(6) (emphasis added).

 . Section 1821(d)(13)(D) of FIRREA expressly limits the jurisdiction of the courts to examine claims not presented first to the Receiver, and permits *de novo* review only of those claims initially presented to the Receiver in the manner set in FIRREA. Section 1821(d)(13)(D) provides:

Except as otherwise provided in this subsection, *no court shall have jurisdiction over*—

(i) *any claim or action for payment from, or any action seeking a determination of rights with respect to,* the assets of any depository institution for which the Corporation has been appointed receiver, including

assets which the Corporation may acquire from itself as such receiver; or

(ii) *any claim relating to any act or omission of such institution or the Corporation as receiver.*

12 U.S.C. § 1821(d)(13)(D) (emphasis added). Federal courts do not therefore have subject matter jurisdiction over claims asserted against the RTC, as receiver, until those claims are first presented to, and administratively determined by, the RTC. *See, e.g., United States v. Altman,* 762 F.Supp. 139 (S.D.Miss.1991); *In re First City Nat'l Bank and Trust Co.,* 759 F.Supp. 1048, 1051 (S.D.N.Y.1991); *United Bank of Waco, N.A. v. First Republic Bank of Waco, N.A.,* 758 F.Supp. 1166, 1168 (W.D.Tex.1991); *Bank of New England, N.A. v. Callahan,* 758 F.Supp. 61, 63 (D.N.H.1991); *see also* H.R. No. 54(I), 101st Cong., 1st Sess. 418–19 (1989), *reprinted in* 1989 U.S.CODE CONG. & AD-MIN.NEWS, at 214–215 (claimant must exhaust streamlined administrative procedures before bringing claim in district court).

Neither Scott, prior to bankruptcy, nor the DIP, since the bankruptcy filing, have ever filed a claim with the RTC either for the turnover of Tract II or for the damages now sought.[7] The RTC argues that, because the DIP has not exhausted its administrative remedies as required by FIRREA, this court does not have subject matter jurisdiction to hear this controversy. The RTC does not suggest that the administrative claims process is still open to the DIP at this late date in the RTC's administration of the failed Southwest Federal Savings—only that section 1821(d)(13)(D) deprives this court of jurisdiction over this dispute because that avenue was not pursued before.

The RTC's argument is facially appealing, but a closer reading of the entire statute reveals the argument to be too facile:

[T]he proper analysis for courts to use when confronted with a statute purport-

---

7. The DIP has also never received actual notification of any claims procedure, or any deadline by which to file claims.

ing to restrict their jurisdiction over matters submitted for an initial administrative determination, is to first ascertain whether Congress intended to limit jurisdiction over the matter *sub judice*, and then to determine whether the alternative remedies are adequate. If the court concludes that either inquiry is in the negative, then it should decline to withhold the exercise of its jurisdiction.

*All Season's Kitchen, Inc. v. FDIC (In re All Season's Kitchen, Inc.)*, 145 B.R. 391, 394 (Bankr.D.Vt.1992). The DIP in this lawsuit seeks two forms of relief: turnover of Tract II and damages for the RTC's wrongful possession. Neither fall within the ambit of FIRREA's claims adjustment process.

We look first at the turnover portion of this adversary proceeding, to see whether section 1821(d)(13)(D) bars this court from exercising jurisdiction and entering a dispositive order regarding that dispute. Such an action would be barred if it were either (1) a claim (or action for payment) from the assets of any depository institution for which the RTC has been appointed the receiver or (2) an action seeking a determination of rights with respect to the assets of such an institution. 12 U.S.C. § 1821(d)(13)(D). Each of these possibilities will be examined below. Then we will turn our attention to the damages portion of this adversary proceeding to see whether that portion of the suit must first be submitted to the administrative claims process.

A. *An action to recover property wrongfully in the possession of the RTC is not a "claim" within the meaning of FIRREA*

■ FIRREA's limitation on jurisdiction assures that "any claim ... from ... the assets of any depository institution for which the Corporation has been appointed receiver" must first be submitted to FIRREA's administrative claims procedures, before any court may exercise any jurisdiction over the dispute. *See* 12 U.S.C. §§ 1821(d)(6), (d)(13)(D). "Claims from the assets of a failed depository institution"

are those rights to payment held by *creditors* of the failed institution, such as, for example, former employees, vendors, and other institutions that might have lent money to the failed institution before its closure. It is for the administration and payment of these sorts of claims that this portion of FIRREA was enacted. An examination of the structure and the antecedents of the statute confirm this conclusion.

■ The claims adjustment procedures in FIRREA were enacted in response to the Supreme Court's decision in *Coit Joint Venture v. Federal Savings & Loan Ins. Corp.*, 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989), in which the Supreme Court had questioned whether Congress had granted the FSLIC *"exclusive* authority to adjudicate *creditors'* state law claims against failed savings & loan associations under an FSLIC receivership." *Coit*, 489 U.S. at 568, 109 S.Ct. at 1366 (emphasis added). Throughout FIRREA, references are continually made to the *creditors* of the failed financial institution for which the RTC serves as receiver. Similarly, FIRREA's legislative history consistently refers to Congress's concerns over handling the claims of an institution's creditors. *See, e. g.*, H.R.Rep.No. 54(I), 101st Cong., 1st Sess. 331, *reprinted in*, 1989 U.S.Code Cong. & Admin.News 86, 127 ("[t]he bill establishes a claims procedure, with specific deadlines for *creditors* and for the FDIC, to be followed in cases where the FDIC has been appointed receiver") (emphasis added). "[T]he statute discusses 'promptly publish[ing] a notice to the depository institution's *creditors* to present their claims' [12 U.S.C. § 1821(d)(3)(B) ]; 'mail[ing] a notice ... to any creditor *shown on the institution's books'* [12 U.S.C. 1821(d)(3)(C) ]; and, 'pay[ing] *creditor* claims which are allowed by the receiver [12 U.S.C. § 1821(d)(10)(A) ].'" *See In re Purcell*, 150 B.R. 111, 113–14 (D.Vt.1993) (emphasis supplied); *see also Office & Professional Employees Int'l Union, Local 2 v. Federal Deposit Ins. Corp.*, 962 F.2d 63, 66 n. 7 (D.C.Cir.1992) ("section 1821(d)(6) requires a *creditor* of a failed financial institution to file an administrative claim"). Indeed, "a

'claim' under FIRREA means an obligation owed *by* the failed institution, and not an obligation owing *to* it." *All Season's Kitchen,* 145 B.R. at 394 (emphasis added). FIRREA itself offers no suggestion that Congress intended that debtors who owe money *to* the RTC must also submit any disputes they might have to the FIRREA claims determination process. *Purcell,* 150 B.R. at 113–14.

■■■■■ The distinction between the claims of creditors and the disputes of debtors in the context of FIRREA is ever so important. The term "creditor," while nowhere expressly defined in FIRREA, clearly refers to those entities that extended credit *to* the failed financial institution. 12 U.S.C. § 1821(d)(3)(B) (creditors to receive notice by mail are those with claims listed "on the institution's books"). Debtors of a failed depository institution *owe* obligations to the institution. In fact, it is these obligations, in the form of loans made, to which the RTC succeeds as *assets* of a failed financial institution. *See Gilman v. FDIC,* 660 F.2d 688 (6th Cir.1981) (loans in failed bank's portfolio are its assets). FIRREA of course provides for the transfer of these assets of a failed depository institution to the receiver, *see* 12 U.S.C. § 1821(d)(2)(A), and confers on the receiver the power to operate the institution and its assets, § 1821(d)(2)(B)(i), the authority to collect all of its obligations (including outstanding loans), § 1821(d)(B)(ii), and the authority to preserve and conserve those assets, § 1821(d)(2)(B)(iv). FIRREA also authorizes the receiver to liquidate those assets. 12 U.S.C. § 1821(d)(2)(E). The determination of claims *against* those assets is governed by an extended claims adjustment process, *see* 12 U.S.C. § 1821(d)(3)–(13). Thus, the administration *of* these assets, *e.g.,* the collection of loans, the sale of loan portfolios, the operation of the failed institution's real estate owned, and so forth may indeed *involve* disputes in which some other party related to that asset asserts a right against the RTC, but these disputes arise on the opposite side of the ledger, as it were, from the claims administration process.

■■■ The assertions of debtors contesting some aspect of their indebtedness *to* the failed financial institution are disputes arising incident to asset administration, as opposed to claims administration. The FIRREA administrative claims process logically makes no provision for the assertions of debtors that they have paid down their loans more than they have been given credit for, for that is not a matter of claims administration; it is a matter of assets administration. Nor does the claims administration process provide for debtors' disputes of deficiencies resulting from commercially unreasonable foreclosure sales; nor does it provide for debtors' protest, as in the case at bar, where the failed institution exercises control over a piece of property (ostensibly via its efforts at enforcing the debt) that the institution in fact has no right to. All such disputes fall completely outside the ambit of FIRREA's claims adjustment process for these are not so much claims against the assets awaiting distribution following liquidation, *see* 12 U.S.C. § 1821(d)(11), as they are items which tend to determine whether there even *is* an asset available for liquidation (or perhaps whether the amount or value of the asset is as much as the receiver claims it to be).[8]

FIRREA is also silent regarding the authority "to release property securing [the RTC's] claims from liens that are defective or improperly perfected." *All Season's Kitchen,* 145 B.R. at 399. "Had Congress actually intended to allow the [RTC] to determine the validity of its lien on a debtor's property, it is reasonable to expect that it would have (a) provided notice to liened debtors, and (b) granted [the RTC] explicit authority to provide the appropriate relief." *See All Season's Kitchen,* 145 B.R. at 395 n. 3.

---

**8.** The notions discussed here are not new. Similar concepts permeate general accounting principles. The same notion is also reflected in the way we distinguish actions in the nature of recoupment from affirmative counterclaims. *See Matter of Holford,* 896 F.2d 176, 178 (5th Cir.1990).

The DIP, in this turnover action, does not make a claim to the assets of the failed institution, and is not a "creditor" of the failed institution. The DIP does not seek payment "out of" the assets of the failed institution. Indeed, the DIP is more like a *debtor* than a creditor, for its dispute grows out of the failed institution's enforcement of a debt obligation against Scott. The gravamen of the turnover action is that the failed depository institution, in the process of enforcing this debt obligation, took property that did not belong to it, and that the RTC is still holding onto that property—wrongfully. Neither Scott nor the DIP have ever extended credit to the failed depository institution. Scott *obtained* credit *from* the institution. Scott was a *debtor*, not a creditor. The promise he made to repay the money he borrowed from Lamar constituted one of Lamar's assets; the property he pledged to Lamar on which Lamar foreclosed, being Tract I, was also an asset of Lamar. The DIP does not assert any claim to be paid out of either of these assets via the turnover action. It is not a creditor within the meaning of FIRREA with regard to the turnover action, and the turnover action itself is not a claim within the meaning of FIRREA. *See, e.g., In re Purcell,* 141 B.R. 480, 482 (Bankr.D.Vt.1992) ("claim" as used by FIRREA refers to obligations owed by FDIC, not obligations owed to FDIC), *aff'd,* 150 B.R. 111 (D.Vt.1993) (affirming bankruptcy court decision that debtor's complaint to determine validity of FDIC's lien is outside of FIRREA); *All Season's Kitchen,* 145 B.R. at 294 (debtor's complaint to determine validity of FDIC's lien is outside administrative claims handling process established by FIRREA).

The noticing provisions associated with FIRREA's claims adjudication process confirm that the procedure was never intended to apply to the sort of dispute we have in this case. Even though the debtor of a failed institution could conceivably put a claim before the RTC, the structure of the claims administration is obviously not designed to accommodate such claims. Mailed notice is only given to creditors on the books of the institution. 12 U.S.C. § 1821(d)(3)(B). Publication notice is also available, but the publication will itself be aimed at entities who have extended credit to the failed institution, and would not likely pass muster as adequate notice for *debtors* who might have claims of the sort involved here. "While the [RTC] is also required to provide publication notice, such notice would not inform a *debtor* that FIRREA's administrative claims procedure applied to him or her, since the publication notice speaks only to creditors." *Purcell,* 150 B.R. at 115 (emphasis added).[9] Provision is also made for claims filed out of time when notice was not received, but the statute does not expressly *require* the agency to consider them. 12 U.S.C. § 1821(d)(5)(C). If the statute was designed to operate as broadly as the RTC here contends, one would expect Congress to have been more explicit in designing procedures to accommodate such claims in accordance with notions of due process. As it is, one must squeeze such actions as this into the cracks in order to make a fit, strongly suggesting that Congress did not contemplate broadly applying this claims adjustment process to apply as well to the adjustment of disputes arising out of the RTC's administration of the *assets* of the failed institution. *Metropolitan Edison Co. v. People against Nuclear Energy,* 460 U.S. 766, 776, 103 S.Ct. 1556, 1562, 75 L.Ed.2d 534 (1983) (court cannot attribute to Congress the intention to open the door to obvious incongruities and undesirable possibilities); *see also Purcell,* 150 B.R. at 114; *Armstrong v. Maple Leaf Apartments, Ltd.,* 436 F.Supp. 1125, 1143 (N.D.Okla.1977); *aff'd in part,* 622 F.2d 466 (10th Cir.1979); *cert. denied,* 449 U.S. 901, 101 S.Ct. 271, 66 L.Ed.2d 131 (1980) (primary element of due process is notice).

---

**9.** In any event, the RTC had *actual notice* of the DIP's claim here, so publication notice would be inadequate to satisfy due process. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 318, 70 S.Ct. 652, 659, 94 L.Ed. 865 (1950)

("where the names and post-office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency").

The clearly expressed congressional purpose behind FIRREA's claims adjustment procedure [10] is satisfied by a construction that applies that process only to the failed institution's creditors, and does not try to extend it to every conceivable dispute in which the RTC might find itself embroiled during a given receivership.

### B. FIRREA Does Not Apply Since Tract II Was Not An Asset of Southwest Federal

Even though the turnover action does not involve the resolution of a claim, as that term is used in FIRREA, it might arguably qualify as "an action seeking a determination of rights with respect to the *assets of [a] depository institution* for which the Corporation has been appointed receiver...." *See* 12 U.S.C. § 1821(d)(13)(D)(i) (emphasis added). The statute facially restricts the court's original jurisdiction over such actions. FIRREA does not define the term "asset of a depository institution," although its definition is crucial here.

■ Any federal court has jurisdiction to make certain threshold factual findings to determine if it has jurisdiction over a given controversy. *See Purcell*, 150 B.R. at 115 (citing *In re Visioneering Construction*, 661 F.2d 119, 122 (9th Cir.1981)); *In re Ellwanger*, 140 B.R. 891, 896 (Bankr. W.D.Wash.1992) (bankruptcy court has jurisdiction to determine its jurisdiction). If Tract II is not a bona fide "asset," within the meaning of the statute, then section 1821(d)(13)(D)(i) will not apply, and will serve as no bar to this court's exercise of jurisdiction. *Cf. FDIC v. Merchants Nat. Bank of Mobile*, 725 F.2d 634, 639 (11th Cir.), *cert. denied*, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984).

■ Bankruptcy courts have disagreed on the application of section 1821(d)(13)(D)(i) with regard to assets which are "disputed assets" of a failed financial institution. *Compare All Season's Kitchen*, 145 B.R. at 402–03 (courts have original jurisdiction over disputed assets) *with Amsave Credit Corp. v. RTC (Matter of American Mortgage and Investment Services, Inc.)*, 141 B.R. 578, 581 (Bankr.D.N.J.1992) (courts have no original jurisdiction over claims to disputed assets). This court agrees with the *All Season's Kitchen* court's analysis, which found that FIRREA's administrative claims exhaustion requirement is not yet invoked at the stage in which a court is determining whether the res in question is even an "asset" within the meaning of the statute. The plain language of the statute (§ 1821(d)(13)(D)(i)) bars a court's original jurisdiction only over *assets* of a failed depository institution. *All Season's Kitchen*, 145 B.R. at 402. "The plain language of the statute, as we understand it, limits our jurisdiction only if [the RTC] in fact has an asset. Accordingly, we believe that the Bankruptcy Court, in the exercise of its jurisdiction to determine jurisdiction, must determine whether [the RTC] in fact has an asset." *Id.* at 402–03.[11]

■ In general terms, an "asset of a failed depository institution" is anything formerly owned by a defunct bank which the RTC, as receiver of such a institution, can liquidate for the purposes of reimbursing the failed bank's depositors and other creditors. *See Village South Joint Venture v. FDIC*, 733 F.Supp. 50, 51 (N.D.Tex. 1990). The Fifth Circuit has explained that an asset of a failed financial institution has three primary characteristics:

(a) it embodies a probable future benefit that involves a capacity, singly or in combination with other assets, to contribute directly or indirectly to future net cash flows,

(b) a particular entity can obtain the benefit and control others' access to it, and

---

**10.** *See* H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 331 (1989); *see also Coit Joint Venture v. Federal Savings & Loan Ins. Corp.*, 489 U.S. 561, 568, 109 S.Ct. 1361, 1366, 103 L.Ed.2d 602 (1989).

**11.** Ours is a simpler case than was *All Season's Kitchen*, for there can be no real "dispute" over whether Tract II was an asset of the depository institution for which the RTC was appointed receiver. *See* discussion *infra*.

(c) the transaction or other event giving rise to the entity's right to or control of the benefit has already occurred.

See NCNB Texas National Bank v. Cowden, 895 F.2d 1488, 1498 (5th Cir.1990) (quoting Financial Accounting Standards Board, Statement of Financial Accounting Concepts No. 6, p. 26). As receiver, the RTC succeeds to such tangible assets as personal property, Gosnell v. FDIC, 938 F.2d 372, 374 (2d Cir.1991) (assets of defunct Seamen's Bank for Savings included extensive collection of paintings, ship models, books, and other pieces), and real property (in the case at bar, for example, Tract I is an asset, as it was properly acquired by Lamar in a regularly conducted foreclosure sale). The RTC also now owns certain other intangible "balance sheet" assets of the failed institution which qualify as legitimate "assets," such as interests in subsidiaries, see Victor Hotel Corp. v. FCA Mortgage Corp., 928 F.2d 1077, 1080 (11th Cir.1991) (assets included all stock in wholly owned subsidiary); interests in loan participation agreements, see First Indiana Federal Savings Bank v. FDIC, 964 F.2d 503, 507 (5th Cir.1992); and loan obligations see Deera Homes, Inc. v. Metrobank For Savings, FSB, 812 F.Supp. 375, 376 (E.D.N.Y.1993) (assets included mortgage note). Furthermore, courts have held that the RTC succeeds to "off-balance sheet" intangible assets like causes of action in favor of the failed institution, see FDIC v. Jenkins, 888 F.2d 1537, 1541 (11th Cir.1989) (assets include claims against directors, officers, and employees of the bank); and the fiduciary appointments of the failed institutions' trust departments, see NCNB Texas National Bank v. Cowden, 895 F.2d 1488, 1498 (5th Cir.1990).

Prior to foreclosure, Tract II was, at best, only collateral for the Note (and only then if a reformation action succeeded). The loan obligation between a lender and a borrower constitutes an asset of the lender, but the collateral securing the loan is not. In re The Landing Associates, Ltd., 122 B.R. 288, 294 (Bankr. W.D.Tex.1990) and cases cited therein. The mortgagee as lienholder has at best an expectancy interest in the collateral, and is not entitled to possession and control of the property or the rents or profits therefrom until the lien is properly enforced. Id. Prior to foreclosure, the collateral itself is not an asset of the mortgagee. Id.; see also Karcher v. Bousquet, 672 S.W.2d 289 (Tex.Civ.App.—Tyler 1984, writ ref'd n.r.e.) (mortgage is mere lien on property and vests no estate in mortgagee).

Collateral securing a note fails the Fifth Circuit's three-pronged test for determining an "asset" of a failed financial institution. Collateral does not contribute to cash flow of a bank, nor may a bank, except as agreed to by the borrower, control access to the collateral. See Cowden, 895 F.2d at 1498. Therefore, prior to foreclosure, only the Note was an asset of Southwest Federal, not Tract II (and not even Tract I).

Nor did Tract II become an "asset" of Lamar post-foreclosure. A purchaser at a foreclosure sale may only purchase what the trustee was authorized to sell under the Deed of Trust. Tract II was not described (and therefore not conveyed) in the Deed of Trust, the Renewal Deed of Trust or the related security agreements between Lamar and Scott. Because the Deed of Trust and related security agreements did not include a description of Tract II, the trustee under the Deed of Trust had no authority to sell Tract II at the foreclosure sale. See Stone v. Williams, 358 S.W.2d 151, 155 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.) (where description of property in deed of trust was inaccurate, there was no legal foreclosure on undescribed tracts). Hence, Lamar could only have purchased, at most, Tract I and the improvements thereon. Lamar could not have purchased Tract II, nor could it assert ownership over any improvements on Tract II, even though those improvements constituted an integral part of the building on Tract I, because the trustee under the Deed of Trust did not have Tract II to sell in the first place. Id.

As neither Lamar nor its successors held legal title to Tract II post-foreclosure, Tract II cannot be an "asset of a failed depository institution" under the *Cowden* test, notwithstanding the purported foreclosure. *See* 895 F.2d at 1498. Tract II was never conveyed as collateral from the very beginning, was never foreclosed by the Substitute Trustee, was never sold by that trustee, was never acquired by Lamar, and so was never transferred along the trail of failed depository institutions that ultimately ended at the doorstep of the RTC. That the RTC occupies the building *as though* Tract II were its asset does not, of course, make it so for purposes of the statute (or for any purposes at all, for that matter).

Since the Petition Date, Tract II has been inarguably the property of the DIP, not Lamar and not the RTC. FIRREA's jurisdictional bar applies only to actions seeking a determination of rights with respect to *assets* of a failed depository institution not to property merely *claimed* to be an asset by the receiver. 12 U.S.C. § 1821(d)(13)(D); *see Purcell*, 150 B.R. at 115.

To what sorts of disputes *do* the provisions of section 1821(d)(13)(D)(i) apply, then, if not to disputes such as this? The statute itself supplies part of the answer, for subsection (d)(5)(D) sets forth a procedure for resolving claims of creditors who assert a security interest in an asset of the institution, and gives the receiver general authority to "disallow any portion of any claim by a creditor or claim of security, preference, or priority which is not proved to the satisfaction of the receiver." 12 U.S.C. § 1821(d)(5)(D)(i), (ii).[12] The procedure is not unlike that employed by trustees in bankruptcy, who also bring actions to determine validity and priority of security interests in assets and to recover preferential transfers. And the dispute that might arise between the RTC and one claiming a security interest in such an asset is a dispute that is excluded from the subject matter jurisdiction of the federal courts until such time as the administrative process has been exhausted.

The case law is also replete with examples. To whom, for example, may an injured person look for redress in a "slip and fall" case where the RTC is acting as receiver of a defunct bank that was an allegedly negligent franchisee of an inn? *See DeCrosta v. Red Carpet Inns Int'l., Inc.*, 767 F.Supp. 694, 695 (E.D.Pa.1991). Who has the right to control collection of a loan, where virtually the entire loan has been sold under a participation agreement to another institution now asserting right of control? *See First Indiana Federal Savings Bank v. FDIC*, 964 F.2d 503, 506 (5th Cir.1992). Who is responsible to the employees of a failed financial institution for the lack of contributions and wrongful termination of a pension plan when that institution fails? *See Rosa v. RTC*, 938 F.2d 383, 391 (3rd Cir.1991). What are the rights of a depositor of a failed depository institution who relied on a clerk's oral misrepresentations that each of his separate $100,000 certificate of deposit was federally insured? *See Bruneau v. FDIC*, 785 F.Supp. 585, 586 (E.D.La.); *aff'd*, 981 F.2d 175 (5th Cir.1992); *cert. denied*, — U.S. ——, 113 S.Ct. 2413, 124 L.Ed.2d 636 (1993). These sorts of disputes also involve assets of the failed institution, the resolution of which could conceivably interfere with the RTC's prompt winding up of a failed financial institution's affairs, and which are justifiably subject to the FIRREA claims adjustment procedures here under discussion. They are different in kind from disputes such as the one *sub judice*, which arise from the RTC's succeeding to the failed financial institution's status as debt collector, for which no special remedy is either needed or appropriate. As Tract II was not, in fact, an asset of the failed financial institution, Southwest Federal, when it failed (because it was instead an asset of the bankruptcy estate), the court finds that section 1821(d)(13)(D)(i) does not require the DIP to submit its efforts to recover Tract II to FIRREA's

---

**12.** The claims of the Federal Reserve are excluded from this process. *Id.,* at (iii).

administrative claims process. *See Purcell,* 150 B.R. at 115–16.[13]

### C. DIP's Claims for Damages are not Subject To FIRREA Claims Process

The previous two sections have discussed the impact of FIRREA on the DIP's turnover action. We turn now to whether FIRREA prevents this court from considering the DIP's claim for affirmative damages arising from the RTC's continued wrongful possession of Tract II during the bankruptcy.[14]

■■■ Section 1821(d)(13)(D)(ii) specifically requires that a claimant submit "any claim relating to any act or omission" by the RTC as receiver to FIRREA's administrative claims process before a federal court may exercise its jurisdiction. The subsection is not limited to claims against assets of the failed depository institution, as in subsection § 1821(d)(13)(D)(i). Rather, it relates in the first instance to the tort liability of the failed bank. *See, e.g., RTC v. International Insurance Co., Inc.,* 1993 WL 21452 (E.D.La. Jan. 27, 1993) (section applies to claims of negligence of officers and directors of failed savings association). But the section also applies to claims arising from the actions of the RTC itself while acting as receiver. *See, e.g., RTC v. Ryan,* 801 F.Supp. 1545, 1557 (S.D.Miss.1992) (section applies to counterclaim against RTC for RTC's conversion of check); *Nepstad v.*

*FDIC,* 1992 WL 455434 (D.Wy. Nov. 17, 1992) (section applies to claim from FDIC's breach of contract to forbear from foreclosure).

■■■ As this court held earlier, in its Order on Plaintiff's Motion for Partial Summary Judgment, the claims for damages at issue here accrued no earlier than the Petition Date; that was the *earliest* the DIP could have held a claim against anyone, for it did not exist as a legal entity before that point in time. Any "claim" held by the DIP against the RTC, within the ambit of subsection (d)(13)(D)(ii), also accrued no earlier than that date. As receiver of a failed financial institution, the RTC was required to provide notice of FIRREA's administrative claims process to all of the failed financial institution's *creditors.* Those creditors whose names and addresses appear on the books of the failed financial institution would have received notice by mail, per the statute, while all creditors whose identities were unknown to the RTC would receive notice by publication. 12 U.S.C. § 1821(d)(3)(B)(i). When the RTC discovers the name and address of a creditor not otherwise listed (*i.e.,* has actual knowledge of the creditor), the RTC must mail notice of the claims bar date to that creditor. 12 U.S.C. § 1821(d)(3)(B)(ii); *see also Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 318, 70

---

13. Southwest Federal did not fail until *after* the bankruptcy petition was filed. Thus, as of that date, it was the DIP that owned Tract II, not Scott. The distinction is important because a reformation action was not sustainable against the DIP, and only by way of such an action could Tract II even colorably have been an asset of Southwest Federal. As this court found in its Order Granting Motion for Partial Summary Judgment, a reformation action is not sustainable against a *bona fide* purchaser for value under Texas law, and the Bankruptcy Code confers on the DIP the status of *bona fide* purchaser for value with respect to real property. *See Cities Serv. Oil Co. v. Dunlap,* 115 F.2d 720, 722 (5th Cir.1940); *Clark v. Snider,* 738 S.W.2d 49, 52 (Tex.App.—Texarkana 1987, no writ); *Alkas v. United Savings Ass'n of Texas, Inc.,* 672 S.W.2d 852, 859 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.); *see also* 11 U.S.C. § 544(a)(3); *Spring Serv. Tex., Inc. v. McConnell (In re McConnell),* 122 B.R. 41, 45 (Bankr.S.D.Tex. 1989). Perhaps had there been no bankruptcy

the RTC might be able to argue that, by virtue of the remedy of reformation yet being available, Tract II should be deemed to be an asset of Southwest Federal and the dispute over it hence governed by section 1821(d)(13)(D). Perhaps, though the question is hardly free from doubt. *See In re Purcell,* 150 B.R. at 115–16. The intervention of bankruptcy, however, changes everything, because no such reformation action is any longer sustainable, and the RTC can lay no other claim to the property as an asset.

14. At least a portion of the DIP's damage claim arises out of the failure of Southwest Federal to surrender possession of Tract II to the DIP, damages which would have accrued between the time of the bankruptcy filing in April 1991 and the failure of Southwest Federal in July 1991. That claim has an arguably different character from the independent claim of the DIP against the RTC.

S.Ct. 652, 659, 94 L.Ed. 865 (1950) ("Where the names and post-office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency").

■ In the case at bar, the DIP's damages claims against the failed bank for the three months between the bankruptcy filing and the institution's failure would not have been carried on the books of a bank, and so the DIP never would have received a mailing of notice of the claims bar date (though conceivably it was the recipient of publication notice). This adversary proceeding was initiated in August, 1991, barely a month after the RTC was appointed receiver, and well before the FIRREA claims bar date. Therefore, the RTC had *actual notice* of the DIP's claim against it for damages. Under FIRREA, the RTC was required to mail notice of the claims bar date to the DIP, but apparently did not. 12 U.S.C. § 1821(d)(3)(C)(ii) (receiver required to mail notice to any claimant who does not appear on the institution's books, within thirty days after discovering the claimant's name and address).

Thus, even if FIRREA provided the DIP an adequate administrative remedy for its damages claims, the passage of time appears now to have closed that avenue. *See* 12 U.S.C. § 1821(d)(5)(C)(i) (RTC must disallow any claim filed after the passage of the date specified in the notice published pursuant to 12 U.S.C. § 1821(d)(3)(B)(i)). Subsection (d)(5)(C)(ii) relieves a claimant from the finality of disallowance if "(I) the claimant did not receive notice of the appointment of the receiver in time to file such claim before such date; and (II) such claim is filed in time to permit payment of such claim." 12 U.S.C. § 1821(d)(5)(C)(ii). Unfortunately, "notice of the appointment of the receiver" is an undefined term, and it is not clear whether actual notice is sufficient or whether the notice contemplated is the formal notice described in subsection (d)(3)(B).

Potentially, the administrative procedures, if applied to claims such as the one presented here, would violate the due process rights of the DIP.

■ This notice failing would thus appear to bar the RTC's "exclusive jurisdiction" argument, on constitutional grounds. U.S. CONST., AMEND. V. However, the Fifth Circuit has ruled recently that the RTC's failure to mail notice of FIRREA's claims bar date will *not* operate as a waiver of the exhaustion of administrative remedies requirement, and a district court would therefore not have subject matter jurisdiction over the creditor's claim, notwithstanding the procedural glitch. *See Meliezer v. RTC*, 952 F.2d 879, 883 (5th Cir.1992). The case involved a claim by the purchasers of a home, asserting that Home Savings had been negligent in allowing them to assume the loan when the lender knew that there was insufficient insurance to cover a fire loss to the property (a loss which they in fact suffered). They had assumed the loan nearly three years before the failure of the institution; the fire took place almost a year before the closure. And notice was not given to the Meliezers. Notwithstanding this failing, the court noted that "a statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and imposes a consequence for failure of compliance." *Id.*, citing *Fort Worth Nat'l Corp. v. Federal Sav. & Loan Ins. Corp.*, 469 F.2d 47 (5th Cir.1972). It then concluded that the agency would not *lose* jurisdiction simply because it had failed to observe this procedural requirement. *Id.*[15] While not decided on constitutional due process grounds, *Meliezer* appears to bar any complaints about the failure of notice in this case relative to the subject matter jurisdiction question. Because due process was *not* expressly argued before the Fifth Circuit in *Meliezer*, however, we must address it here.

---

**15.** The logic here is a bit fuzzy, as a finding that the agency has not *lost* jurisdiction is not the same as a finding that the agency has *exclusive* jurisdiction. The tenor of the opinion, however, confirms that the court was merely disposing of

the argument that exclusive jurisdiction had been *waived*. It accepted as a given that the statute on its face otherwise confers exclusive jurisdiction on the agency.

■ We are faced with the task of construing a statute so as to avoid its unconstitutionality, if possible. In construing a statute, courts are, to the extent feasible, to avoid that construction that might render the statute unconstitutional. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *see Boos v. Barry*, 485 U.S. 312, 330–31, 108 S.Ct. 1157, 1168–69, 99 L.Ed.2d 333 (1988) (federal courts have power to adopt narrowing constructions of federal legislation and have duty to avoid constitutional difficulties by doing so if such a construction is fairly possible); *Commodity Futures Trading Comm. v. Schor*, 478 U.S. 833, 841, 106 S.Ct. 3245, 3251, 92 L.Ed.2d 675 (1986) (federal statutes are to be construed as to avoid serious doubt of their constitutionality, if such a construction is fairly within the legislative will of Congress); *see also Metropolitan Edison Co. v. People against Nuclear Energy*, 460 U.S. 766, 776, 103 S.Ct. 1556, 1562, 75 L.Ed.2d 534 (1983) (court cannot attribute to Congress the intention to open the door to obvious incongruities and undesirable possibilities).

■ The Fifth Circuit in *Meliezer* did not address the impact of subsection (d)(5)(C) and its provisions for mandatory disallowance of claims and the constitutional issue was not raised by the parties to the appeal. The decision thus affords us little guidance for the task at hand. We know that the statute should be construed, to the extent possible, so as to avoid finding that it violates the due process rights of claimants. We also know, from *Mullane*, that an agency with actual knowledge of a person whose substantive rights are to be affected by the actions of the state has a duty to afford actual notice to that person such that that person has a meaningful opportunity to respond. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 318, 70 S.Ct. 652, 659, 94 L.Ed. 865 (1950).

The statute here in question makes express provision for such actual notice, consistent with *Mullane*, in subsection (d)(3)(C)(ii) (the provision for giving notice to claimants as soon as their name and address are discovered). The statute also insulates those not having such "actual notice" from the binding effect of a final disallowance, in subsection (d)(5)(C)(ii) (the provision relieving a claimant from final disallowance if notice is not received in time). The notice contemplated in subsection (d)(5)(C) appears to be the very one described in (d)(3)(C). It is true, as the *Meliezer* court observed, that there is no specific penalty for the agency's failure to give the notice described in subsection (d)(3)(C), but the statute *does* say "[t]he receiver *shall* mail a notice ..." 12 U.S.C. § 1821(d)(3)(C). It is difficult to see how the word "shall" could mean anything but *shall.*

■ But suppose then that the notice has not been sent as directed and the claim is therefore not allowed. The statute says that the receiver may nonetheless consider the claim (provided it is filed in time to permit payment of such claim). In view of the due process considerations involved, we may fairly read "may" as *must* here. Thus, it would appear that the DIP can, after all, still submit its damages claim to the RTC, which must in turn consider them. And so it would appear that the jurisdictional bar is intact and the holding of *Meliezer* controlling (albeit for slightly different reasons than those expressed in that opinion).

The disturbing aspect of this finding, however, is that the RTC has waited until this very late date in the proceedings to raise this issue, imposing substantial costs and hardship on the bankruptcy estate and demonstrating an almost cavalier disregard for the economical use of judicial resources. Must this matter, after all this time, be sent into the administrative claims adjudication process, only to have a *de novo* trial in the district court should the outcome prove to be unsatisfactory? Was this, all along, simply a trial stratagem on the part of the lawyers?

Courts ought properly to shrink from sanctioning such tactics (if tactics they be), and the law gives to courts ample re-

sources with which to combat such conduct on the part of parties and their attorneys (even when the party is the United States). Fortunately, in this case, it may prove to be unnecessary to foray into such distasteful issues, for there is a line of cases that holds that, in circumstances such as this, FIRREA's administrative claims process will be held to have been satisfied—by the RTC's pursuit of its claim against the DIP's estate in this court, rendering it unnecessary for the court to decline jurisdiction. We turn to that line of cases.

*1. The RTC's Pursuit of Southwest Federal's Proof of Claim Satisfies FIRREA's Administrative Claims Process*

■ On July 29, 1991, Southwest Federal filed a proof of claim against the DIP's estate for $3,134,215.78, the deficiency claim on the Note. The RTC, as receiver of Southwest, has pursued this claim against the estate.[16] Section 1821(d)(5)(D)(i) authorizes the RTC to "disallow any portion of any claim by a creditor ... which is not proved to the satisfaction of the receiver." Throughout the eighteen months that this case has been pending, the RTC has pursued the Southwest Federal claim for its full amount, in spite of the DIP's counter-assertion of its claims against the RTC and its attempts at a global settlement. The RTC, however, has declined to make any allowance whatsoever for whatever setoff damages there might be for its continued wrongful possession of Tract II. The RTC argues that it is entitled to the full amount

of Southwest Federal's proof of claim, and that the DIP is entitled to nothing.

■ The position of the RTC, in substance, has led to precisely the result that could be anticipated in an administrative review of the DIP's claim against the RTC. It amounts to an affirmative disallowance of that claim pursuant to section 1821(d)(5)(D)(i). "[W]hen [the RTC] makes a claim against others, it has in fact already engaged in the kind of administrative deliberative process that FIRREA was entitled to provide for claims against it." *All Season's Kitchen,* 145 B.R. at 396. FIRREA's administrative claims process seems thus to have been satisfied, and the court may exercise jurisdiction over the present matter. *Cf. Continental Financial Resources, Inc. v. FDIC,* 149 B.R. 260, 262 (Bankr.D.Mass.1993) (finding bankruptcy court jurisdiction after FDIC files proof of claim against bankruptcy estate).[17] Any other result elevates form over substance.

*2. Application of the Administrative Claims Process to Case at Bar is Contrary to Intent Supporting Bankruptcy Code and FIRREA*

■ Furthermore, to hold that the administrative claims process has not been satisfied would be contrary to the respective intent behind FIRREA and the Bankruptcy Code. Congress drafted FIRREA's administrative claims procedure for the quick and just resolution of such claims against the RTC.[18] "The claims determina-

---

**16.** The RTC has not filed proof of transfer of claim from Southwest Federal to itself pursuant to Bankruptcy Rule 3001(e). *See In re Ellington,* 151 B.R. 90 (Bankr.W.D.Tex.1993). Nevertheless, the RTC has vigorously pursued the claim and any objection by the DIP regarding the ownership of the claim is saved for determination in the claims adjudication process. For the purposes of this decision only, the court will treat Southwest Federal's claim as properly transferred to the RTC.

**17.** The court declines to go so far as did the court in *Continental Financial Resources,* for the filing of a proof of claim has more traditionally been held to constitute a *submission* to jurisdiction than a *waiver* of jurisdiction in some other forum. *Langencamp v. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990). An objection

to a court's lack of subject matter jurisdiction cannot, of course, be waived.

**18.** The Fifth Circuit has noted that the primary purpose underlying FIRREA's exhaustion scheme "allows the RTC 'to perform its statutory function of promptly determining claims so as to quickly and efficiently resolve claims against a failed institution without resorting to litigation.'" *Meliezer v. RTC,* 952 F.2d 879, 883 (5th Cir.1992) (quoting *Rosa v. RTC,* 938 F.2d 383, 396 (3rd Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991)). The legislative intent behind the statute underscores the irony of the case at bar. Despite the clear legislative intent behind FIRREA, the RTC has done *nothing* in this case quickly or efficiently. In fact, the RTC has consistently involved this court in disputes which could have been settled

tion procedure ... creates a system which ... enables the FDIC to dispose of the bulk of claims against failed financial institutions *expeditiously and fairly."* H.R.REP. No. 54(I), 101st Cong., 1st Sess., *reprinted in* 2 U.S.CODE CONG. & ADMIN.NEWS 86, 215 (emphasis added). Similarly, an underlying purpose of the bankruptcy system is to centralize all litigation involving the debtor in one forum, so as to settle the debtor's estate expeditiously. *See In re Best Products Co., Inc.* 140 B.R. 353, 356 (Bankr. S.D.N.Y.1992) ("chief purpose of the bankruptcy laws is to secure a *prompt and effectual* administration and settlement of the debtor's estate within a limited period") (emphasis added). The instant adversary proceeding was initiated in August 1991. The DIP was granted summary judgment with respect to its rights in Tract II in February 1992. Yet, the RTC never attempted to make use of the claims disposition process available under FIRREA—never, that is, until the eve of trial in this case. For the RTC to *now* claim, almost a year after the DIP was awarded summary judgment and almost a year and a half after the initiation of this adversary proceeding, that the DIP's claim should have been presented first to the RTC is an affront to the intentions underlying both federal statutes, and should not be entertained by any court. To submit this claim to an administrative process at this late stage would actually *frustrate* FIRREA, as it would *delay* the claims determination process. Needless to say, it would also frustrate the bankruptcy administration as well.

On policy grounds, therefore, the court should not entertain this last ditch effort at delay and forum shopping unless the law otherwise commands such an unjust result. For the reasons discussed above, the court is comfortable concluding that the law in fact does not command such a result. The

RTC's argument that this court lacks subject matter jurisdiction to proceed in this adversary proceeding is therefore rejected.

## II. EXEMPLARY DAMAGES

▄▄▄ The DIP seeks $265,000 in exemplary damages. The RTC seeks summary judgment on the issue, arguing that, as an agency of the United States, the doctrine of sovereign immunity bars an award of punitive damages against it. The RTC's position is correct.

▄▄▄ 12 U.S.C. § 1441a(b)(1)(A) provides for the establishment of the Resolution Trust Corporation as an "instrumentality of the United States." Generally, agencies of the United States cannot be held liable for punitive damages absent Congressional authorization. *See, e.g., Missouri Pacific R.R. Co. v. Ault,* 256 U.S. 554, 563–64, 41 S.Ct. 593, 597, 65 L.Ed. 1087 (1921); *Smith v. Russelville Credit Assoc.,* 777 F.2d 1544, 1549–50 (11th Cir.1985); *Painter v. Tennessee Valley Authority,* 476 F.2d 943, 944 (5th Cir.1973). Congress has not specifically provided that the RTC can be held liable for exemplary damages, and absent such a statutory grant, a court cannot award exemplary damages.

▄▄▄ Exemplary damages are penal in nature. They are awarded for the dual purposes of punishment of the wrongdoer and deterrence of others from similar wrongful conduct. *See Professional Asset Management, Inc. v. Penn Square Bank, N.A.,* 566 F.Supp. 134, 136 (W.D.Okla. 1983). "In the context of the liquidation of a failed bank, as here, these considerations carry little weight." *Id.* The RTC, as receiver, "does not simply stand in the shoes of its predecessor bank." [19] Rather, as receiver, the RTC represents the failed bank,

---

without judicial intervention. The RTC has continually turned a deaf ear to the DIP and to this court when confronted with facts and law not to its liking. The RTC offers the multiple levels of approval required by the RTC management structure in explanation of its unfailing lack of cooperation throughout this case. It appears that this seemingly endless chain of command is the reason that it took more than a year and a half for the RTC to motion for summary judg-

ment on the basis of a statute which is intended to resolve claims against the RTC within 180 days. The problem here is not with the statute but with the institution that the statute is designed to assist.

**19.** *FDIC v. National Union Fire Ins. Co.,* 630 F.Supp. 1149, 1156 n. 4 (W.D.La.1986). While the *National Union Fire* case discussed the potential liability of the FDIC, the reasoning is

its depositors, creditors and shareholders. *Professional Asset Management,* 566 F.Supp. at 136 (citing *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139, 147–48 (3rd Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). An award of exemplary damages against the RTC would not serve as a punishment against the bank, so much as it would punish innocent creditors and uninsured depositors seeking recovery from the assets of the failed bank. *Id.* at 137; *see Anderson v. Hershey,* 127 F.2d 884, 887 (6th Cir.1942) ("punitive double penalty" does not apply to receiver; an award would adversely "affect creditors and depositors who were in no way connected with or responsible for" the alleged bad conduct). As the cost of deterrence would necessarily be at the expense of innocent others, an award of exemplary damages cannot, under current law, be granted.[20] *Professional Asset Management,* 566 F.Supp. at 136. The RTC is granted summary judgment with respect to the exemplary damages issue.

### III. EMOTIONAL DISTRESS DAMAGES

The DIP seeks to recover $250,000 in damages to the estate for the emotional distress Scott allegedly suffered due to the RTC's continued possession of Tract II. The RTC counters that damages for emotional distress are not recoverable against the RTC as a matter of law.

■ As a general proposition, at least, the RTC's position is not correct. An aggrieved party may, in certain cases, be able to recover emotional distress damages from a federal receiver. *See, e.g., FDIC v. Rusconi,* 796 F.Supp. 581, 597–98 (D.Maine

1992) (claims against federal receiver for intentional and negligent emotional distress survive motion for summary judgment). However, the RTC is correct in urging that the DIP *in this case* is not entitled to emotional distress damages as a matter of law.

In Texas, "[d]amages for mental anguish cannot be recovered absent a showing of an intentional tort, gross negligence, willful and wanton disregard, or accompanying physical injury." *Farmers and Merchants States Bank of Krum v. Ferguson,* 617 S.W.2d 918, 921 (Tex.1981). "The term 'mental anguish' implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation." *Trevino v. Southwestern Bell Telephone Co.,* 582 S.W.2d 582, 584 (Tex.Civ.App.— Corpus Christi 1979, no writ).

■ The instant cause of action did not accrue until the Petition Date. As such, only the DIP, and not Scott, may bring this cause of action. The damages for emotional distress can accrue only for the "mental suffering" of the DIP, and not the suffering of Scott. And DIP's, as fiduciaries of bankruptcy estates, cannot, as a matter of law, suffer compensable mental anguish for another's wrongful possession of property of the estate. They are acting in an "official capacity," and so are presumed not to "suffer" in the compensable way individuals do. Mental suffering and emotional distress are thus not available remedies for DIP's as such.

---

nevertheless applicable to the RTC since the RTC performs for the thrift industry a parallel role to the FDIC's position for banks.

**20.** Other courts which have considered awards of punitive damages against agencies of the United States acting as receivers of failed institutions, have come to similar conclusions. *See, e.g., FDIC v. National Union Fire Ins. Co.,* 630 F.Supp. 1149, 1156 n. 4 (W.D.La.1986) ("an award of punitive damages against the receiver would not punish the bank, but its innocent

creditors and uninsured depositors"); *Summers v. FDIC,* 592 F.Supp. 1240 (W.D.Okla.1984) (treble damages not recoverable against FDIC in RICO suit); *FDIC v. Soden,* 603 F.Supp. 629, 633 (D.Kan.1984) (FDIC not subject to treble damages under Bank Holding Company Act); *FDIC v. Tito Castro Constr., Inc.,* 548 F.Supp. 1224, 1226 (D.Puerto Rico 1982) (FDIC not subject to punitive provisions of usury statute), *aff'd* 741 F.2d 475 (1st Cir.1984).

▮▮▮ Nor may the DIP recover for the alleged mental anguish of Scott, the human being who occupies that role in this bankruptcy case.[21] When an individual files for protection under chapter 11 of the Bankruptcy Code, that individual is the beneficiary of many useful legal fictions created by the statute. For example, the DIP is granted the status of bona fide purchaser of real property pursuant to 11 U.S.C. § 544(a)(3). As previously mentioned, this statutory grant is the sole reason that the DIP could even bring the instant adversary proceeding. But the Bankruptcy Code does not impute the knowledge of an individual who files for chapter 11 to the subsequent debtor-in-possession. 11 U.S.C. §§ 1107, 544(a)(3), 550(a). Nor is the debtor-in-possession imputed with the *emotions* of the individual debtor. Whatever traumas Scott has had to endure since this case was filed, he may not recover for them; nor may the DIP.

Accordingly, the DIP is not entitled to damages for mental anguish, and the RTC's Motion for Summary Judgment in that regard is granted.

### IV. "PROVABLE" AND "UNPROVABLE" DAMAGES

The DIP seeks damages for the RTC's wrongful possession of Tract II, and in addition, seeks recovery for prejudgment interest, attorneys' fees and emotional distress. The RTC moves for summary judgment on the grounds that these claims were not "provable" against the RTC at the time of the RTC was appointed receiver, and should therefore not be recoverable against the RTC as a matter of law.

▮▮▮ Traditionally, courts have applied equitable principles when considering claims against receivers. *See, e.g., Penn. Steel Co. v. New York City Ry. Co.,* 198 F. 721, 738 (2d Cir.1912). Essentially, to recover against a receiver, the claim must be "provable" against the failed institution at the time the receiver is appointed. By requiring provability, a court balances two equitable principles, "the substantial right of all creditors to share in their debtor's property, and the necessity for expeditious administration." *Id.* A court must fashion rules which are practical, as well as equitable. *Id.* To aid in this process, courts have divided claims against receivers into three categories:

(1) Claims which at the commencement of proceedings furnish a present cause of action;

(2) Claims which at that time are certain but which are not matured;

(3) Claims which are contingent.

*Id.* at 738. The first two classes are always provable against the receiver, but the contingent claim class must be further subdivided into:

(1) Claims of which the worth or amount can be determined by recognized methods of computation at a time consistent with the expeditious settlement of the estates;

(2) Claims which are so uncertain that their worth cannot be so ascertained.

*Id.* at 739–40. In applying these classifications, the *Penn. Steel* court stated "[c]laims which when presented within the time limited by the court for their presentation are certain or are capable of being made certain by recognized methods of computation, should be allowed. Claims which are not then certain should be disallowed because they afford no basis for making dividends. But there is no equitable reason why claims which are certain when presented and which are presented in time should have been certain at some arbitrary anterior period." *Id.* at 741–41; ac-

---

**21.** It is important to recall that Scott's *prepetition* mental anguish is not an element of this lawsuit, for such "suffering" could only be recoverable to the extent that the underlying possession and control of Tract II is wrongful—and there was a pending state court lawsuit seeking reformation of the deed of trust which, had there been no bankruptcy, would in all likeli-

hood have resulted in reformation of the deed of trust to conform to the original intentions of the parties. Only the DIP, against whom reformation is not an available remedy, has any claim for damages—but that claim cannot antedate the appointment of the DIP, which is the date of the petition.

cord *First Empire Bank–New York v. FDIC*, 572 F.2d 1361, 1368–69 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). With this general background, we turn to consider each of the otherwise allowable elements of damages in this case.

### A. Damages for Wrongful Possession and Prejudgment Interest

Under the *Penn. Steel* test, the actual damages the DIP suffered are "provable" as a matter of law. The instant adversary proceeding is of the type described in the first category by the *Penn. Steel* court, *i.e.*, "[c]laims which at the commencement of proceedings furnish a present cause of action." Since the Petition Date, the bankruptcy estate has assumed the role of a bona fide purchaser of Tract II. 11 U.S.C. § 544(a)(3). Upon the filing of this adversary proceeding, a present cause of action existed between a bona fide purchaser and one in wrongful possession of the purchaser's property. In such situations, the cause of action of trespass (which this court has determined is applicable to these facts) is well settled in the law. As the DIP had a valid present cause of action at the commencement of these proceedings arising from the RTC's present and continuing wrongful occupation of the DIP's real property, the resulting damages from that valid cause of action are "provable" within the meaning of the *Penn. Steel* test.[22]

The DIP's claim for prejudgment interest is also not "unprovable" under the *Penn. Steel* test. Prejudgment interest is only awarded to victorious parties, so it is a contingent claim as of the filing of the suit. Contingent claims, under *Penn. Steel*, fall into two categories: those that can be reasonably calculated by a recognized method and those that cannot. Only the former can be asserted against the receiver. Prejudgment interest is awarded by courts on a frequent basis using recognized methods of computation. *See, e.g., Dallas–Fort Worth Regional Airport Board v. Combustion Equipment Associates, Inc.*, 623 F.2d 1032, 1040–42 (5th Cir. 1980) (discussing availability and established methods of calculation of prejudgment interest in Texas). Therefore, a claim of prejudgment interest is not of the type prohibited under *Penn. Steel*. The RTC's motion for summary judgment on this issue is therefore denied.[23]

### B. The DIP's Claim for Attorneys' Fees

The Fifth Circuit has ruled concerning the allowance of attorneys' fees from litigation against a federal receiver that such claims run "afoul of the requirement that the assets of a failed bank be ratably distributed among the bank's creditors holding approved or adjudicated claims." *Interfirst Bank of Abilene v. FDIC*, 777 F.2d 1092, 1096 (5th Cir.1985). Because the attorneys' fees would be paid from the limited pool of assets of the failed depository institution in competition with the claims of creditors of that institution, such an award would disrupt the pro rata distribution to be effected by the receiver. *Id.*

Furthermore, the Fifth Circuit noted that a claim for attorneys' fees is not "provable" against the receiver at the time of appointment, and is therefore, not available to the claimant. *Id.* The instant claim for attorneys' fees did not exist at the time of the RTC's appointment, and the attorneys' fees were not fixed and certain in amount

---

**22.** It is worth pointing out that there is nothing "contingent" about this claim, even though the damages continue to accrue on a monthly basis. There is no "external" event rendering the claim contingent. There is only the "internal" present event of the RTC's own breach. When the triggering event for liability is the conduct of the defendant (as here), the claim arising therefrom is no more contingent than the claim arising from, say, a breach of contract. There is either an actual breach and resulting liability, or there is no breach at all and no contingent liability.

The temporary trespass cause of action here accruing in favor of the DIP is thus in no wise "contingent," though it is "continuing."

**23.** However, the prejudgment interest can only be calculated from the date of the bankruptcy petition forward, as Southwest Federal's occupation of Tract II prior to the filing is not a cause of action which passes to the bankruptcy estate (at least not without its companion affirmative defense of reformation).

at the time the suit was filed against the RTC. *See id.* As the American Rule requiring each party to bear their own attorneys' fees is only altered in favor of a victorious party, and even then only on occasion, a claim for attorneys' fees against a receiver is a contingent claim, not able to be determined expeditiously by a recognized method of calculation. *See Penn Steel,* 198 F. at 739–40. Such a claim can only be determined at the end of a litigation, as the expenditures of time and money on a particular litigation differ between attorneys because of skill, intelligence, novelty of the issues, cooperation of one's adversary, etc. Therefore, a claim for attorneys' fees is a contingent claim, incalculable at the initiation of the suit, and cannot be awarded against the RTC. The RTC's Motion for Summary Judgment on this issue is granted.

### CONCLUSION

For the reasons stated herein, the RTC's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

So **ORDERED.**